## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

COLORS+,

                        Plaintiff,

        -vs-

COLORS+ COUNSELING, LLC, et al.,

                       Defendants.

**Case No. 1:25-cv-00078-PAB**

**JUDGE PAMELA A. BARKER**

**MEMORANDUM OPINION AND ORDER**

Currently pending is Plaintiff Colors+ ("Plaintiff," "Colors+," or "Youth Center") Motion for Preliminary Injunction ("Motion").  (Doc. No. 5.)  Defendants Colors+ Counseling, LLC ("Counseling"), Kameron Pepera ("Kameron"), and Lennon Pepera ("Lennon")[1] filed a Brief in Opposition on February 10, 2025 to which Colors+ replied on February 17, 2025.  (Doc. Nos. 15, 17.)  The Court conducted a hearing on the Motion over the course of two days, March 28, 2025 and April 8, 2025 ("the hearing").  (*See* 3/28/2025 Docket Entry; 4/9/2025 Docket Entry.)  The Parties submitted Supplemental Briefs on April 24, 2025.  (Doc. Nos. 30, 31.)  For the following reasons, Colors+'s Motion for Preliminary Injunction (Doc. No. 5) is GRANTED IN PART and DENIED IN PART as set forth below.

---

[1] Defendants Kameron and Lennon are referenced in the Complaint and on the docket by the names "Kristen" and "Lisa" respectively.  (*See* Doc. No. 1.)  However, at the preliminary injunction hearing, they indicated that they preferred to be referenced as Kameron and Lennon.  (*See* 3/28/2025 Hearing Tr., 4:3-21.)  Accordingly, consistent with the preliminary injunction hearing, the Court refers to the Peperas as Kameron and Lennon in this Opinion.

## I.     Background

This case involves a dispute over the ownership, trademarking, and use of a service mark (hereinafter "the Mark").  The Mark in dispute[2] is shown below:



### A.     The Parties

Plaintiff Colors+ is a 501(c)(3) non-profit corporation formed on January 12, 2018, and existing under the laws of the state of Ohio.  (Doc. No. 1 at PageID #2.)  Colors+ operates Colors+ Youth Center, an LGBTQ+ youth center whose purpose is to strengthen LGBTQ+ youth and allies by promoting individual and community wellness.  (*Id.*)  Defendants Kameron and Lennon (collectively, "the Peperas") co-founded Colors+, and Colors+ has been governed by a board of directors (hereinafter "Colors+ Board" or "Board") since March 22, 2018, if not earlier.  (*Id.*)

In August 2018, seven months after the founding of Colors+, the Peperas formed Defendant Counseling as a for-profit limited liability company to provide for-profit mental health services, resources, and education to the LGBTQ+ community and the community at large.  (*Id.*)  At the time they formed Counseling, the Peperas served on the Colors+ Board.  (*Id.*)  Kameron and Lennon later served as executive director and deputy director of Colors+ respectively.  (*Id.*)

---

[2] As explained further below, the Mark in dispute shown here is an updated version of a similar logo that had been created previously.

According to Kameron, she began "practicing online [and] working with people … at least by September of 2018, and then started seeing people in December in person" through the counseling practice while using the name "Colors+ Counseling."  (*See* 4/8/2025 Hearing Tr., 235:1-7.)  Kameron further testified that Colors+ opened its doors and began having services around January 23, 2019.  (*Id.* at 238:7-11.)

Colors+ leased its business premises from a third party and granted a license to Counseling to use no more than 20% of the premises to conduct its business.  (Doc. No. 1 at PageID #3.)  Counseling had offices in the Colors+ offices—i.e., Colors+ and Counseling shared the same space—until July 2024.  (3/28/2025 Hearing Tr., Doc. No. 23, 38:24-39:4 85:2-17; 4/8/2025 Hearing Tr., Doc. No. 26, 264:14-16.)

## B.    The Mark

### 1.    Creation of Original Logo

The Mark at issue is an updated version of an original logo (hereinafter the "Original Logo") created by Lennon.  With respect to the creation of the Original Logo, Lennon's affidavit provides as follows:

> "In January 2018, I created a logo for the Youth Center which Kameron and I intended to be used on the Youth Center's website and marketing material.  It was also our intention to use the logo in connection with Counseling as the two entities shared offices and resources."[3]

(*Id.* at PageID #219.)  On January 13, 2018, the Original Logo was digitized and refined.  (*See* Doc. No 28-18 at PageID #999–1001; *see also* Doc. No. 15-8 at PageID #220 (indicating that Lennon "engaged designers to help … digitize and refine the images").)  Thereafter, the Original Logo was

---

[3] Lennon's affidavit also provides: "I did not assign any rights in my designs to the Youth Center for its exclusive use as we intended to, and did, incorporate the same logo for Counseling's marketing materials."  (Doc. No. 15-8 at PageID #220.)

used by Colors+ and the Counseling practice.[4]  (*See* 4/8/2025 Hearing Tr., 345:6-11.)  The Original

Logo is shown below:



(Doc. No. 15-8 at PageID #220.)

---

[4] Defendants, in their Post-Hearing Brief, assert that "Kameron and Lennon Pepera both testified that Counseling began using the name 'Colors+ Counseling' in 2017, before they created the Youth Center and began using that name in interstate commerce through its Psychology Today listing."  (Doc. No. 30 at PageID #1020.)  The Court declines to give weight to this testimony for numerous reasons.  First, Defendants contend that *Counseling* began using the name in 2017—yet Counseling as an entity did not exist until August 18, 2018, when its Articles of Organization were filed.  (*See* Doc. No. 28-2 at PageID #900–903.)  Second, Kameron and Lennon's testimony on this point is unsubstantiated by any other evidence in the record.  Third, even if this Court were to find the testimony credible that Kameron and Lennon used the phrase "Colors+ Counseling" on Psychology Today in 2017, the Court finds such testimony insufficient to demonstrate use in *interstate* commerce as Defendants suggest.  Unlike the lengthy and detailed testimony and examples offered by both Colors+ and Counseling with respect to their own interstate commercial activities, this brief testimony regarding the phrase "Colors+ Counseling" allegedly being used on Psychology Today in 2017 does not provide sufficient details, examples, or indications that the phrase was used in interstate commerce—particularly in light of the testimony by Kameron that she wanted to "build some awareness that we were *going to be* having the private practice," implying that the private practice did not yet exist and thus could not be offering services so as to have "used in commerce" the name "Colors+ Counseling LLC."  (*See* 4/8/2025 Hearing Tr., 235:13-16 (emphasis added)); *see also* 15 U.S.C. § 1127 (defining the term "use in commerce" with respect to services as, in relevant part, "when [a mark] is used or displayed in the sale or advertising of services *and the services are rendered in commerce*") (emphasis added).  Simply put, no services of the private practice could be "rendered in commerce" if the private practice did not yet exist.  § 1127.  Accordingly, at this stage, the Court declines to give weight to this testimony.

The Original Logo differs from the updated Mark at issue.  Unlike the updated Mark,[5] the "+"
symbol on the Original Logo above does not include the "progress flag"—i.e., the white, pink, blue,
brown, and black flag located on the left side of the "+" symbol in the updated Mark.

> **2.**     **Creating the Mark by Updating Original Logo to Include "Progress Flag"**

The Parties do not dispute the following.  On November 21, 2020, the Colors+ Board met and
discussed incorporating the progress flag into the Original Logo.  (*See* 3/28/2025 Hearing Tr., 127:4-
12, 169:5-11; *see* 4/8/2025 Hearing Tr., 266:5-8; Doc. No. 27-1 at PageID #871–78.)  In January
2021, another Colors+ Board meeting was held in which the "logo" was discussed.  (*See* 3/28/2025
Hearing Tr., 169:12-17; *see* 4/8/2025 Hearing Tr., 266:5-9; Doc. No. 27-1 at PageID #879–884.)
Following these meetings, the Original Logo was updated to include the progress flag.  The newly
created Mark (at issue in this case) is shown below:



> **3.**     **Differing Narratives of Trademark Ownership/Registration of the Mark**

Aside from the above, *see supra* Section I.B.2, Colors+ and Defendants' narratives regarding
the creation of the new Mark are vastly different.  Specifically, the Parties dispute whether the
November 2020 and January 2021 Board Meetings involved discussions surrounding the

---

[5] *See infra* Section I.B.2.

trademarking of the Mark—including whether discussions were had regarding trademarking the Mark in Counseling's name as opposed to Colors+'s name.

The Court sets forth the two competing narratives below.

### a)  Colors+ Narrative Regarding Trademarking the Mark

According to Colors+, trademarking the Mark under Counseling's name was *never* discussed at the November 2020 and January 2021 Board meetings.

At the preliminary injunction hearing, Peter Finnerty ("Finnerty"), who joined the Colors+ Board in 2018 and is the past president of the Board,[6] testified that he attended the November 2020 Board meeting.  (*See* 3/28/2025 Hearing Tr., 127:4-6.)  Finnerty explained that at the meeting, the Board "talked about adding the Progress flag to the logo," as well as other things including programming and Kameron and Lennon serving as executive directors of Colors+ and not Board members. (*See id.* at 127:7-1284.)  Finnerty further testified that he attended the January 2021 Board meeting.  (*See id.* at 128:5-7.)  When asked whether he "recall[ed] any discussion at all about trademarking the logo at that meeting," Finnerty answered, "No."  (*Id.* at 128:12-15.)  Finnerty also testified as follows:

> Q:  Do you recall any board meetings at which it was discussed that Counseling owned a logo?
> A:  No.
> Q:  How about any meetings where it was discussed that Counseling would allow Colors+ to use a logo?
> A:  No.
> Q:  Do you remember any meetings where it was discussed that Counseling would pay for registration of a logo?
> A:  No.
> Q:  And do you recall a meeting at which Kameron and Lennon Pepera asked Colors+ to pay for the registration of a logo?

---

[6] (*See* 3/28/2025 Hearing Tr., 123:1.)

6

A:  No.

(*Id.* at 126:16-127:3.)

According to Finnerty, and based on the discussions at the November 2020 and January 2021 Board meetings, his understanding was that: (i) "the nonprofit owned the trademark"; (ii) Colors+ was paying for the changes to the logo to include the progress flag; and (iii) no one ever told him otherwise about "who owned the logo" or "who owned the trademark of that logo."  (*Id.* at 129:11-130:12.)  Finnerty testified that Colors+ had been using the logo to advertise its nonprofit services since the creation of the logo.  (*Id.* at 131:19-24.)

Shannon Scott-Miller ("Scott-Miller"), who joined the Colors+ Board in 2019,[7] testified that she attended both the November 2020 and January 2021 Board meetings.  (*Id.* at 168:24-169:1.)  With respect to the November 2020 Board meeting, Scott-Miller testified that she remembered "a lot of discussion about making sure that … we had the full Progress flag …" (*Id.* at 169:5-11.)  As for the January 2021 Board meeting, when asked what she recalled about the logo at that meeting, Scott-Miller answered: "Having a sample of it to say that the board approved of it."  (*Id.* at 169:12-17.)  Scott-Miller also testified as follows:

> Q:  Was there ever a board meeting at which it was discussed that Counseling owned the logo that Colors+ had been using?
> A:  No.
> Q:  And was there ever a board meeting at which it was discussed that Counseling would allow Colors+ Youth Center to use the logo?
> A:  No.
> Q:  How about a meeting where there was discussion about Counseling paying for the logo?
> A:  No.
> Q:  Was there ever a meeting at which it was discussed that Colors+ did not want to pay to register the logo as a trademark?
> A:  No.

---

[7] (*See* 3/28/2025 Hearing Tr., 165:7-8.)

7

> Q: And was there ever a meeting at which Kameron and Lennon Pepera asked Colors+ to pay for … redesigning the logo?
> A: Yeah. We had two meetings talking about designing the logo. One was in November of 2020, and one was in January 2021. I know one of them, we talked about the fact that the nonprofit was paying for it. I don't remember which one of those it was, and we spent a lot of time talking about the redesign and what that looked like.

(*Id.* at 168:6-169:4.)

When asked for her understanding as a Board member about who owned the Colors+ logo, Scott-Miller answered that "the nonprofit owned the logo, that we were paying for it, it was on all our things" and indicated that Colors+ has been using the logo "[s]ince the day it started." (*Id.* at 169:24-170:2; 172:21-23.) Scott-Miller testified that the first time she understood that Counseling claimed to own the trademark of that logo was "[w]hen I was asked to come in and testify. I never heard that before." (*Id.* at 173:5-8.)

Colleen Cronin ("Cronin"), the current President of the Colors+ Board who joined the Board in approximately May 2022,[8] testified that the Wix Complaint filed in September 2024[9] "was the first that I had heard that Counseling had … the trademark" and that she "had always understood that the nonprofit owned the trademark, that was what was conveyed … by Kameron to a whole meeting full of people …" (*Id.* at 42:4-8.) Specifically, Cronin testified that she attended a meeting full of people, including Kameron and a web designer named Susan Panning. (*Id.* at 42:4-11.) At the meeting, Susan "asked if we actually held the trademark." (*Id.* at 44:16-17.) Cronin testified that Kameron, in response, "conveyed … to us that the trademark was registered and that we owned it …" (*Id.* at 44:6-8.) According to Cronin, "the whole meeting was for the Youth Center, and the Counseling

---

[8] (*See* 3/28/2025 Hearing Tr., 28:24-29:1.)

[9] The Court discusses this Wix Complaint in further detail below.

8

practice was never even mentioned." (*Id.* at 44:8-10.)  This testimony was corroborated by Scott-Miller.  (*Id.* at 170:6-11.)

Based on this meeting, Cronin testified that Colors+ "knew that the logo was trademarked, but we thought it was trademarked to the nonprofit." (*Id.* at 47:1-2.)  Cronin's testimony was that following the Wix Complaint in September 2024,[10] another individual looked up the trademark and reacted "Holy moly, … they registered our trademark in their name." (*Id.* at 47:2-6.)  According to Cronin, it was after this discovery or revelation that she brought this discovery to the Board, which was "shocked and angry" but also "surprised." (*Id.* at 54:15-21.)  Finally, when asked to confirm that Colors+ "got to use that logo," Cronin answered that "we paid for it, so we owned it.  It wasn't that we got to use it; we owned it, we made the logo, and paid for it." (*Id.* at 101:16-18.)

Colors+ points to other evidence in the record to support their narrative, beginning with the November 2020 and January 2021 Board minutes.  First, Colors+ notes that the Board minutes do not include any information indicating that a discussion about trademarking the Mark in Counseling's name ever occurred.  (*See* Doc. No. 17 at PageID #232-33; *see also* 4/8/2025 Hearing Tr., 276:21-278:1.)  Rather, the only references to the logo in the Board minutes are "New Logo: Evie update" in the November 2020 Board minutes and "Racial Equity: Evie asked how to support equity prime efforts. Discussed efforts with new logo" in the January 2021 Board minutes.  (Doc. No. 27-1 at PageID #878–89.)  Further, the January 2021 Board meeting occurred via "Google Meet," and the associated Board minutes includes the "chat" from the virtual Google Meet room which also makes no mention of either trademarking the Mark or of Counseling—despite containing at least 43 messages during the 71-minute meeting.  (*Id.* at PageID #880–883.)  Finnerty testified that both the

---

[10] *See supra* note 9.

November 2020 and January 2021 Board minutes were accurate.  (*See* 4/8/2025 Hearing Tr., 142:4-25.)

Colors+ also relies upon Kameron's email correspondences with Suzann Moskowitz ("Moskowitz"), the attorney hired to submit the trademark application.  Specifically, Colors+ points to an email from Kameron dated February 10, 2021—after the January 2021 Board meeting had already taken place—in which Kameron indicates that her and Lennon "would like to do it [register the Mark] through our LLC [Counseling] because even the cost with you doing pro bono *might not be approved by our board*."  (Doc. No. 31 at PageID #1028) (citing Doc. No. 27-1 at PageID #762) (emphasis added); (*see also* 4/8/2025 Hearing Tr., 283:2-284:9 (cross-examination of Kameron addressing this email correspondence).)

Finally, Colors+ submits invoices ("Redesign Invoices") from Sabrina Kogan ("Kogan"), the designer who updated the Mark to include the progress flag, in support of its narrative.  (*See* Doc. No. 27-1 at PageID #701–03.)  The Redesign Invoices contain three invoices dated January 5, 2021, January 11, 2021, and March 3, 2022.  (*See id.*)  These Redesign Invoices each describe the services as "Logo Update," "Plus Sign Update," and "Trademark Logo" respectively.  (*Id.*)  Further, the Redesign Invoices list the "Client" as "Colors+ Youth Center."  (*Id.*)  The Redesign invoices are billed at a rate described as "Friends & Family Nonprofit rate of $30/hour."  (*Id.*)

Based on the above, Colors+ asserts that trademarking the Mark under Counseling's name was never discussed at the November 2020 and January 2021 Board meetings.

### b)      Defendants' Narrative of Trademark and Trademark Registration

Defendants offer a drastically different narrative.  According to the Peperas, they informed the Colors+ Board at the January 2021 meeting that Colors+ should trademark the Mark but the Board

10

did not want to pay for the Trademark Registration.  According to the Peperas, they then informed the Board that they would register it under Counseling's name and grant Colors+ blanket permission to use the Mark.

At the hearing, Kameron testified regarding the November 2020 and January 2021 Board meetings.  Specifically, Kameron testified that "in November … of 2020, we discussed updating [the new logo] to include the progress flag, and then in January [2021] we discussed trademarking."  (*See* 4/8/2025 Hearing Tr., 266:5-9.)  With respect to the January 2021 Board meeting "discuss[ing] potentially trademarking the logo," Kameron confirmed that Finnerty and Scott-Miller were in attendance, as well as two others.  (*Id.* at 266:10-14.)  Kameron described the conversation at the January 2021 Board meeting as follows:

> Q:  So tell me about the conversation with the board.
> A:  So we had approached the board because our name and our logo were starting to get more recognition and – even before we revised it, and we wanted to protect that trademark and logo. We had a conversation during that meeting in January of 2021 that we wanted to trademark it.  At that time, again, me and Lennon … just got approved to get paid $250 a month each, and we had told them that we had spoken to a few different lawyers and sought out the prices online as well as to how much that would cost …
> ***
> Q:  How much would it cost?
> A:  $350 if it was just the filing fees.
> Q:  Okay.  Did you find a lawyer who would be willing to do the legal work pro bono?
> A:  Yes.
> ***
> Q:  What was the board's response to trademarking the logo?
> A:  They didn't want to spend the money on it at that time.
> Q:  What did you suggest in response to that?
> A:  Me and Lennon both said that we thought it was really important that it was going to be trademarked so that we could protect the name and the logo.  We had said that if we were unable to do it through the nonprofit since Lennon created it, that we would do it through the for-profit entity and allow both organizations to use the new logo and name.

(*Id.* at 266:15-25; 267:3-7; 267:12-23) (cleaned up).

11

Kameron disputed Cronin's testimony regarding the meeting in which Kameron allegedly indicated that Colors+ owned the Mark.  (*See id.* at 272:1-17.)  Specifically, Kameron testified that she was told that it was "very smart that we got it trademarked," to which she responded "thank you, and … I do checks on Google to make sure that nobody else is using that trademark."  (*Id.* at 272:11-14.)  Kameron denied ever indicating that the nonprofit owned the Mark.  (*Id.* at 272:15-17.)  Finally, when questioned regarding the trademark discussions not being contained in the Board minutes, Kameron testified that "sometimes things were left out of minutes at times."  (*Id.* at 277:22-25.)

Lennon also testified at the hearing regarding the trademark discussions.  According to Lennon,  the Board knew the modified design would be used by both Counseling and Colors+, and that no one on the Board asked Lennon to assign the designs in the logo to Colors+ or expressed concerns about both entities having the same new updated logo.  (*Id.* at 358:6-18.)  With respect to the trademark discussions at the January 2021 Board meeting, Lennon testified as follows:

> Q:  Were you present at the board meeting where the trademark was discussed?
> A:  Yes.
> Q:  Okay.  And can you tell us what you recall about that discussion?
> A:  We had asked the board to help us … get the logo trademarked, and they weren't interested in spending any money on that at the time.  So we told them that we're going to get it trademarked anyways.  We, being Kameron and Lennon, the Counseling practice was going to have it trademarked because it was important to us.
> Q:  Okay.  Do you recall, did anybody on the board express a concern about Counseling trademarking the logo?
> A:  No.  There was not significant conversation around that, which is probably why it's not in the meeting minutes.
> Q:  Was there a vote, do you recall?
> A:  There was no vote.

(*Id.* at 358:21-359:13.)

Defendants also rely on the Trademark Application filed by Kameron on behalf of Counseling.  (Doc. No. 27-1 at PageID #677–86.)  Specifically, the Trademark Application was filed

12

on March 24, 2021.  (*Id.* at PageID #677.)  Following approval of the Trademark Application, the Trademark Registration was issued with a registration date of February 22, 2022.  (Doc. No. 15-4 at PageID #208–10.)   Finally, Defendants point to email communications between Kameron and Moskowitz, the attorney hired to submit the trademark application, to demonstrate that Kameron made it clear that the Mark was to be registered by Counseling but that Colors+ would be permitted to use the Mark.  (*See generally* Doc. No. 27-1 at PageID #762–78.)

### C.      Use of Mark by Colors+ and Counseling

#### 1.      Concurrent Use of the Mark

The new Mark has been used by Colors+ and Counseling since its creation in January 2021.  On January 11, 2021, the Colors+ Facebook account made a post providing, in relevant part:

> "New Year, New Updates for Colors+!  Check out our newly updated and more inclusive logo, revamped website at www.colorsplus.org, and our new newsletter!  Updated Logo by Sabrina Kogan."

(Doc. No. 27-1 at PageID #692.)  According to Cronin, this Facebook post was "like the debut, the premiere, the public announcement" of the new Mark.  (*See* 3/28/2025 Hearing Tr., 49:4-7.)  Cronin also confirmed that Colors+ has been using the Mark to advertise its nonprofit services at the Youth Center since that date.  (*Id.*)  Further, Cronin confirmed that Colors+ had received donations[11] through the website "since the new logo came out" in January 2021.  (*Id.* at 50:19-51:10.)  Cronin could not verify exactly who made the Facebook post but testified that "somebody representing Colors+ Youth Center posted the post on Colors+ Youth Center's Facebook page."  (*Id.* at 76:3-8.)

---

[11] These donations included "out-of-state" donations.  (*See* 3/28/2025 Hearing Tr., 51:10.)

According to Cronin, Counseling "advertise[s] in pretty much every single space that we [Colors+] advertise." (*See* 3/28/2025 Hearing Tr. at 57:7-11.) Similarly, Finnerty testified that Colors+'s target audience was "LGBTQ youth and their families," and that Counseling's target audience "seems to be a very similar target audience." (*Id.* at 133:3-7.)

Colors+ and Counseling often appeared on advertisements together. For example, Colors+ created a tri-fold brochure that included the "+" portion of the Mark to advertise Colors+. (*See* 3/28/2025 Hearing Tr., 36:2-20; Doc. No. 27-1 at PageID #889.) The second page of the brochure includes the name "Colors+ Counseling" while again using the same portion of the Mark. (*Id.*)

The same occurred on Colors+ and Counseling's social media presences. For example, on May 10, 2023, the Colors+ Facebook page posted a job advertising for Counseling in which Counseling utilized the Mark, explaining that "Colors+ Counseling LLC is hiring Independently Licensed Therapists!" (Doc. No. 28-12 at PageID #942.) When asked whether such a post would make it reasonable for Counseling to assume that it could use the Mark, Cronin responded that she was "more concerned that they were using nonprofit assets to promote their private business at this point, which was jeopardizing the nonprofit's actual nonprofit tax-exempt status." (*See* 3/28/2025 Hearing Tr., 91:3-10.) Similarly, on December 7, 2023, the Counseling Facebook page made a Facebook post using the Mark to advertise Counseling. (Doc. No. 28-11 at PageID #941.) The same day, the Colors+ Facebook page reposted that Counseling post with the following text, in relevant part: "Exciting news for our friends at Colors+ Counseling LLC!" (*Id.*) When Cronin was asked whether Colors+ reposting something from Counseling using the Mark indicates that Colors+ was "okay with them using the mark," Cronin answered, "I suppose it does" and noted that "[w]e had a friendly relationship at that point." (*See* 3/28/2025 Hearing Tr., 84:5-14, 85:7.)

14

Cronin testified that she objected to this mixed advertising back then because of her belief that it risked jeopardizing Colors+'s non-exempt status. (*Id.* at 87:13-23.) However, Cronin indicated that she never got as far as objecting to the use of the name "Colors+" in Counseling's name because she was more concerned about preserving Colors+'s 501(c)(3) status and making sure that there was no self-dealing happening. (*Id.* at 87:24-88:9.) Cronin also testified that the Board was not in charge of supervising every exact instance of the use of the Mark, such as reviewing every Facebook post—instead, that would fall upon the executive director with general Board guidance. (*See generally id.* at 89:5-90:10.) Finally, both Cronin and Scott-Miller clarified that Colors+ paid for advertising assets including the marketing, website, brochures, and logo. (*See id.* at 94:21-25, 173:22-25.)

### 2. Alleged Confusion Resulting from Concurrent Use of the Mark

In addition to the shared advertising above, Colors+ offered various examples of alleged "confusion" in the community based on the concurrent use of the Mark. Counseling denies that any such confusion occurred.

According to Cronin, the concurrent use of the Mark has caused confusion in the community. (*See* 3/28/2025 Hearing Tr., 59:1-7.) As an initial matter, Cronin testified that prior to becoming a Board member—when she was donating to Colors+ as a member of the LGBTQ+ community herself—she did not understand that Colors+ and Counseling were two separate entities. (*Id.* at 32:22-33:3.) Rather, she believed that "there was just one nonprofit entity." (*Id.*) As for the confusion of others, Cronin "continually had to explain to people … the difference, that the Counseling and the Youth Center are separate organizations, pretty much whenever I'm talking about the Youth Center." (*Id.* at 59:13-16.) For example, Cronin testified that at a fundraiser "a few weeks ago," she introduced herself to a parent as being with Colors+ Youth Center, to which the parent

15

responded, "oh yes, my kid goes to you for counseling." (*Id.* at 59:17-21.) The parent then asked about programs "at your office in Rocky River," yet Colors+ does not have an office there—rather, that is where Counseling's new office is. (*Id.* at 60:1-5.) Similarly, after the Colors+ Instagram account went offline and Counseling began advertising their online youth group, Cronin was told by a parent that they "thought that we [Colors+] had gone online only." (*Id.* at 113:15-20.) Cronin further testified that she frequently gets phone calls regarding "insurance information" for counseling services and people show up at the Colors+ office looking for their counseling appointments. (*Id.* at 60:5-10.)

Additionally, Cronin testified that she has received contracts written out to her as the "president of the board of Colors+ *Counseling*." (*Id.* at 60:10-12 (emphasis added).) For example, the Alcohol, Drug Addiction & Mental Health Services Board (hereinafter "ADAMHS Board") sent Cronin a contract meant for Counseling. (*Id.* at 61:3-17.) The signature page on the contract read "Colors+ Counseling" followed by a spot for Cronin's signature that read "Colleen Cronin, President"—despite Cronin never having held a position with Counseling. (*Id.* at 61:18-62:3; Doc. No. 27-1 at PageID #748.) Further, a representative from the ADAMHS Board, Erin DiVincenzo ("DiVincenzo"), also testified at the hearing as to this contract. Upon reviewing the contract's signature page, DiVincenzo testified that "there was some confusion when they were putting the contract together."[12] (*See* 4/8/2025 Hearing Tr., 253:17-24.)

---

[12] On direct examination, DiVincenzo initially testified that she was not confused about who the contract was to go to, and that her understanding of the error was that the "contract was sent to the wrong email that was on file by an administrative assistant who handles our contracting process." (*See* 4/8/2025 Hearing Tr., 248:13-18.) In other words, DiVincenzo initially believed that this was a simple mix-up with the email addresses. However, on cross-examination, DiVincenzo was then asked to review the contract itself, and was specifically directed to the last page that contained the signature block for "Colors+ Counseling, Colleen Cronin, President." (*Id.* at 253:17-24.) Upon recognizing that the contract itself was incorrect—and not just the email address—DiVincenzo revised her prior testimony and admitted that "there was some confusion when they were putting the contract together." (*Id.*) Accordingly, the Court gives no weight

16

Moreover, DiVincenzo testified that she herself did not initially understand that Colors+ and Counseling were not the same entity until around July of 2024.  (*Id.* at 245:22-246:5.)  Specifically, DiVincenzo confirmed that she worked with Colors+ for two years without understanding that Colors+ and Counseling were separate entities.  (*Id.* at 250:18-23.)  Cronin similarly testified that she had various conversations with the ADAMHS Board and other donors who all had "varying degrees of understanding of the differences between the two entities and the difference in services between the two entities."[13]  (*See* 3/28/2025 Hearing Tr., 107:2-11.)

Colors+ also presented a printout from the ADAMHS Board website that lists Colors+ as a service provider for "[i]ndividual, couples, and family counseling services to the LGBTQ+ and ally community"—which are services of Counseling and not Colors+.[14]  (*See id.* at 62:9-23; Doc. No. 27-1 at PageID #704.)  Finally, Cronin indicated that Counseling had begun providing similar programs that Colors+ has offered.  (*See* 3/28/2025 Hearing Tr., 63:5-64:20.)  Accordingly, Cronin testified that she believed there is a likelihood of confusion if Counseling continues to advertise its services using the Mark.  (*Id.* at 64:22-65:1.)

---

to DiVincenzo's initial testimony that there was no confusion when putting the contract together, and instead relies upon her later testimony admitting confusion.

[13] During the hearing, there was also testimony as to whether the Three Arches Foundation—another donor—was confused as to the distinctions between Colors+ and Counseling.  However, the Parties later filed a joint stipulation indicating, in relevant part, that "Kameron disclosed, and Three Arches understood, at all times that Colors+ and Counseling were separate entities, and Three Arches was not confused by Counseling's use of the name Colors+ or the Mark."  (*See* Joint Ex. 1A.)  Accordingly, the Court shall disregard any testimony contrary to the joint stipulation.

[14] The Court recognizes that Cronin later testified that this information no longer appears on the ADAMHS Board website.  (*See* 3/28/2025 Hearing Tr., 72:25-73:4.)  However, this only occurred after Cronin contacted the ADAMHS Board and informed them that their website had an incorrect listing.  (*See id.* at 71:9-11.)  Thus, the mere fact that the ADAMHS Board corrected the error *after* being informed of it does not negate an inference of confusion to be drawn from the fact that the error occurred in the first place.

Scott-Miller testified that she observed confusion in the LGBTQ+ community between Colors+ and Counseling.  This included confusion as to "why they're in two separate places," "whether or not the Youth Center is still open," and "confusion over what programs are running at the Youth Center."  (*Id.* at 177:1-5.)  According to Scott-Miller, a grandmother and child were confused as to whether the child "would still be able to go to counseling even if they went to the Youth Center," and that they "were afraid that they would lose their counseling if they continued to attend the Youth Center."  (*Id.* at 178:11-18.)  Scott-Miller testified that numerous individuals at the ADAMHS Board did not initially understand the difference between the entities and that "in the meetings we would have for the trauma program, I had to talk about the fact that I was there for the nonprofit and not … for the Counseling side of things."  (*Id.* at 195:18-196:2.)

During her testimony Scott-Miller was asked to review a screenshot from the website for Plexus—the LGBTQ Chamber of Commerce in the Cleveland area.  (*Id.* at 175:4-6.)  Specifically, both Colors+ and Counseling were listed on the Plexus website.  (Doc. No. 28-9 at PageID #935.)  On the Plexus page for Colors+, the highlights section included a link to "Mental Health Services/Counseling."  (*Id.* at PageID #938.)  In reviewing this page, Scott-Miller confirmed that anyone who "looked at that page … would think that there were counseling services at the Youth Center," and that "whoever created the page might have thought the same thing."  (*See* 3/28/2025 Hearing Tr., 203:13-204:1.)

At the hearing, Colors+ introduced other examples of alleged confusion.  The first was a Facebook post made by a community member on July 1, 2022, that provided, in relevant part: "The Colors+ Youth Center which offers programming and licensed counseling for LGBTQ+ youth opened June 18."  (Doc. No. 27-1 at PageID #779; *see also* 4/8/2025 Hearing Tr., 295:14-296:6.)

18

This post was made even though licensed counseling is a service of Counseling—not Colors+.  (*Id.*)

Next, Colors+ presented an email in which one of Counseling's independent contractors used an

email ending with "@colorsplus.org," and in which she included in her signature line: "Therapist,

Colors+" along with links to Colors+'s website and social media accounts.  (Doc. No. 27-1 at PageID

#781; *see also* 4/8/2025 Hearing Tr., 298:7-24.)

Finally, a Facebook post was made on November 2, 2021, by another local entity in the

community with the caption: "Our friends at Colors+ Youth Center are hiring!!"  (Doc. No. 27-1 at

PageID #780.)  The post, however, included a job posting for Counseling, not Colors+.  (*Id.*; *see also*

4/8/2025 Hearing Tr., 296:7-297:8.)  When questioned about this on cross-examination, Kameron

testified, "Colors+ is part of both names, and for the Counseling, sometimes people call us Colors+

as well."  (*See* 4/8/2025 Hearing Tr., 297:6-7.)  Kameron later reiterated her testimony that there was

"no likelihood of confusion with [Counseling] using the same trademark logo as [Colors+]."  (*Id.* at

324:19-22.)

### D.    Fallout Between the Parties

#### 1.    Kameron's Termination from Colors+

On or about June 16, 2024, Kameron emailed the Colors+ board and notified them that she

would be taking medical leave from June 17, 2024, through July 8, 2024.  (Doc. No. 1 at PageID #3.)

On or about June 28, 2024, Kameron texted the board and stated that her leave would be extended

for another three weeks (*i.e.* through July 2024).  (*Id.*)  According to Colors+, Kameron "made no

arrangements for business coverage during her absence."  (*Id.* at PageID #3–4.)  Accordingly, Cronin

requested administrative access to Colors+ accounts, records and documents to ensure that the Youth

Center could continue to operate.  (*Id.*)  According to Colors+, Kameron refused to provide the requested access.  (*Id.* at PageID #4.)

On July 7, 2024, the Colors+ Board "met to address the untenable situation" and "decided to hire an interim executive director to ensure continued operation of the Youth Center until [Kameron] could return to work …"  (*Id.*)  Because there was no one to run the non-profit in the meantime, the Board hired Scott-Miller on a temporary basis to manage grant obligations, advise the Board, and ensure that Colors+ programming would continue.  (*Id.*)  Scott-Miller had served on the Colors+ Board from April 2019 until becoming Community Engagement Manager in January 2022.  (*Id.*)

On or about July 8, 2024, the executive committee of the Colors+ Board met privately with Kameron via Zoom to explain its decision to hire an interim executive director.  (*Id.*)  According to Colors+, "[t]he executive committee indicated that [Kameron] was not being replaced … [and] that [Kameron] could resume their position as executive director after training."  (*Id.*)  Further, Colors+ alleges that Lennon, that same day, called a meeting of Counseling's staff (many of whom were Colors+ contractors) and "falsely related that Colors+ had fired [Kameron] and replaced them with Scott-Miller."  (*Id.*)  Kameron provided this same "misinformation to Colors+'s contracted summer camp leader who immediately pulled out of the camp," and several other contractors quit their work with Colors+.  (*Id.* at PageID #5.)  Finally, Colors+ alleges that the "Peperas spread the same misinformation to community organizations, donors and grantors, causing Colors+ to lose donors and damaging Colors+'s reputation in the LGBTQ+ and non-profit communities."  (*Id.*)  On July 11, 2024, "[b]ased on [Kameron's] malfeasance, the Colors+ board voted … to terminate [Kameron's] employment," and Kameron was "informed of the termination by letter dated July 15, 2024."  (*Id.* at PageID #5–6.)

20

### 2.    Website and Social Media Complaints for Trademark Infringement

Following Kameron's termination, Defendants took numerous actions against Plaintiff.  One of these actions included Lennon filing a complaint with Colors+'s website host, Wix, for "Trademark Infringement" (hereinafter "Wix Complaint").  (*See* Doc. No. 28-5 at PageID #917–18.)

Specifically, on September 9, 2024, Lennon filed the Wix Complaint for "Trademark Infringement" alleging that Colors+ had been illegally using the Mark which Lennon claimed belonged to Counseling.  (*Id.*)  In the Wix Complaint, when asked "what is the trademark that is infringed," Lennon wrote as follows:

> "The org Colors+ is illegally using a trademarked name and logo that belongs to Colors+ Counseling.  I have attempted to contact them over the past several months and they have not responded to me and my request to stop using the trademark.  The website also shows fraudulent information regarding my name, image, bio and credentials, to say that my partner and I are associated with this organization and we are not. www.colorsplus.org is the fraudulent site.  The programs they claim to be running have completely shut down for months.  There are no active staff members and board members who are listed on the site also contain inaccuracies [sic].  They know that the logo is trademarked."

(*Id.*). Further, in the Wix Complaint, when asked "where and how your trademark is being infringed," Lennon responded: "trademark name and logo, including the rainbow plus sign."  (Doc. No. 28-5 at PageID #918.)  The Wix Complaint also referenced the Trademark Registration with a registration date of February 22, 2022, that trademarked the Mark and listed Counseling as the owner of the Mark.  (*Id.*; Doc. No. 15-4 at PageID #208.)  Similar complaints were filed with other social media sites with which Colors+ had a presence.  (*See* 4/8/2025 Hearing Tr., 305:23-306:4.)

On September 12, 2024, following receipt of the Wix Complaint, Wix disabled the Colors+ website.[15]  (Doc. No. 28-5 at PageID #916.)  Colors+ was not initially aware that its website had been

---

[15] Lennon withdrew the Wix Complaint on October 25, 2024.  (*See* Doc. No. 28-5 at PageID #915.)

taken down.  (*See* 3/28/2025 Hearing Tr., 39:14-40:21.)  However, Cronin eventually received an email from a newspaper asking whether Colors+ was aware that its website was down, leading to Colors+ discovering the "[email] from Wix that says that our website was down because of a trademark violation." (*Id.* at 40:17-18.)  According to Colors+, "[t]his is how the board discovered that Counseling (by [Kameron]) had applied on March 24, 2021 with the U.S. Patent and Trademark Office to register the Colors+ service mark in the name of [Counseling]."[16]  (Motion at PageID #79.)

When asked why the Wix Complaint was made for "trademark infringement," Kameron testified that category was "the one that it best fit" and that her and Lennon were "trying to get our information off of the website." (*See* 4/8/2025 Hearing Tr., 308:10-16.)  Lennon similarly testified that her information was still on the Colors+ website despite her leaving Colors+ in August 2023, and that she "didn't want misinformation about myself" on the website.[17]  (*Id.* at 371:16-372:20.)

---

[16] (*See also* 3/28/2025 Hearing Tr., 42:4-5 ("Well, this was the first time that I had heard that Counseling had … the trademark.") (Cronin); *id.* at 173:5-8 ("Q: When was the first time you understood that Counseling claimed to own the trademark of that logo?" "A: When I was asked to come in and testify. I never heard that before.") (Scott-Miller).)

The Court recognizes Defendants' position that Colors+ has been aware of the Trademark Registration in Counseling's name since January 2021.  As explained below, however, the Court finds Plaintiff's version of the events surrounding the Trademark Registration to be more credible.

[17] Lennon testified that she was concerned that her information was still up on the Colors+ website despite having left the organization in August of 2023.  (*See* 4/8/2025 Hearing Tr., 371:16-372:20.)  Yet notably, Kameron was the executive director of Colors+ until July of 2024, and testified that she was in-charge of the social media and PR for the Youth Center.  (*Id.* at 265:18-20; *see also* 3/28/2025 Hearing Tr., 45:24-25 ("All of the information that was on the website … about them [Kameron and Lennon] was put there by Kameron and Lennon] …") (Cronin).)  Accordingly, it appears that there existed an eleven-month period from August 2023 to July 2024 in which Lennon's information was on the Colors+ website *and* Kameron was in-charge of that same website—and yet, Lennon's information was not removed. Nonetheless, Lennon did not file any Wix complaints during this eleven-month period, and only did so *after* the fallout between the Parties that occurred in July of 2024.  In light of this background and the Court's evaluation of the entire testimony presented at the hearing, the Court finds that Lennon's testimony regarding the reasons for her filing of the Wix Complaint in August 2023 is not credible.

### 3.      Defendants' Actions Following the Parties' Fallout

In addition to the Wix Complaint and other social media complaints, Kameron and Lennon took numerous other actions following the fallout between the Parties.

Beginning on or around August 3, 2024, Kameron sent numerous Facebook messages to various partners or supporters of Colors+.  (*See* Doc. No. 27-1 at PageID #821–63.)  The messages, while varying slightly, generally included the following points.  First, Kameron indicated that she was terminated while on medical leave from Colors+.  (*See, e.g., id.* at PageID #821.)  Second, Kameron mentioned that "[m]ost, if not all, of the mental health providers and staff who are working there currently have quit, been terminated, or are working on an exit plan," that she was "unsure about the status of programs and mental health support due to lack of communication from the board of directors," and that she hoped the non-profit would able to continue to offer programs.  (*Id.*)  Fourth, Kameron indicated that "there have been mistruths being told about the situation" and that she "wanted to be sure you heard from me" because "I don't want to lose our connection to you."  (*Id.*)  Finally, Kameron indicated that her and Lennon "still have our private practice, Colors+ Counseling, LLC, and moved the business because of the situation to Rocky River," and inquired into continuing to support or collaborate with each other.  (*Id.*)

Most of the responses to Kameron's message either: (i) expressly noted that it was their first-time hearing about the situation; or (ii) implied as much based on the individual being shocked at the news.  (*See generally* Doc. No. 27-1 at PageID #821–63.)  At least one individual asked to set up a meeting to "catch up soon so we can learn about Colors+ Counseling."  (Doc. No. 27-1 at PageID #842; *see also* 4/8/2025 Hearing Tr., 301:23-304:12.)  At the hearing, Kameron denied "ever tell[ing] anyone that the Youth Center was closed."  (*See* 4/8/2025 Hearing Tr., 329:12-14.)

23

In addition, Counseling began expanding its array of services.  (*Id.* at 312:4-6.)  For example, Counseling began running a virtual teen empowerment group.  (*Id.* at 313:3-6.)  Counseling's virtual group took place on Wednesdays at 4:00 p.m.  (*Id.* at 313:8-12.)  Notably, Colors+'s "Connections+" drop-in program had already been occurring at the same time—Wednesdays at 4:00 p.m.  (*Id.* at 313:14-20.)  Additionally, Kameron testified that Counseling also offers various art therapy or music therapy programs to individuals, couples, or families,[18] and confirmed that Colors+ has offered those same programs in the past.  (*Id.* at 313:21-314:15.)  Kameron also testified that Counseling has an office at the LGBTQ Community Center of Greater Cleveland ("LGBTQ Community Center") and that the Cleveland Cavaliers awarded a $30,000 grant to the LGBTQ Community Center but was not aware of what the grant was to be used for specifically.  (*Id.* at 314:16-18, 315:17-316:8.)

Since the Parties' fallout, both Colors+ and Counseling have continued to use the Mark or portions thereof.[19]  (*See* Doc. No. 15 at PageID #187; 4/8/2025 Hearing Tr., 317:14-318:19.)  Further, on September 6, 2024, Counseling applied for trademark registration of the name "Colors+ Counseling."  (*See* Doc. No. 27-1 at PageID #755–761.)

## II.    Procedural History

On January 15, 2025, Colors+ filed a Verified Complaint for Preliminary and Permanent Injunctive Relief and Damages against Defendants Counseling, Kameron, and Lennon.  (Doc. No. 1.)  Colors+ asserts 14 claims against Defendants: (1) Lanham Act pursuant to 15 U.S.C. § 1119

---

[18] According to Kameron, Counseling has "always offered those since we've had our therapists the past few years."  (*See* 4/8/2025 Hearing Tr., 313:23-24.)

[19] *See also* https://www.colorsplus.org (last accessed May 4, 2025); https://www.colorscounseling.org (last accessed May 4, 2025); https://www.colorscounseling.org/locations (last accessed May 4, 2025) (using the entire Mark rather than solely the "+" portion of the Mark).

24

(rectifying the trademark registry – transferring ownership of the registered Mark to Colors+); (2) Lanham Act pursuant to 15 U.S.C. § 1119 (rectifying the trademark registry – canceling Colors+ Counseling's 2024 trademark application); (3) Lanham Act violation pursuant to 15 U.S.C. § 1120 (civil liability for false or fraudulent registration); (4) Lanham Act violation (service mark infringement); (5) Lanham Act violation (false advertising); (6) Breach of Fiduciary Duty; (7) Faithless Servant Doctrine; (8) Civil Liability for Criminal Act (Deprivation of U.S. Mail pursuant to R.C. § 2913.01); (9) Civil Liability for Criminal Act (Deception pursuant to R.C. § 2913.01); (10) Civil Liability for Criminal Act (Theft pursuant to R.C. § 2913.02); (11) Civil Liability for Criminal Act (Unauthorized Use of Property pursuant to R.C. § 2913.02); (12) Civil Liability for Criminal Act (Trademark Counterfeiting pursuant to R.C. § 2913.34); (13) Deceptive Trade Practices pursuant to R.C. § 4165.02; and (14) Defamation. (*Id.*)

On January 16, 2025, Colors+ filed the Motion. (Doc. No. 5.) In its Motion, Colors+ seeks an Order from this Court ordering the following relief against Defendants: (i) prohibiting Defendants from using "Colors+" or "Colorsplus" in its company name ("Colors+ Counseling") or to otherwise identify itself or its services; (ii) prohibiting Defendants from using the registered Colors+ service mark; (iii) prohibiting Defendants from representing to any person or entity that Defendants (or any of them) owns the "Colors+" or "Colorsplus" name or registered service mark; (iv) prohibiting Defendants from pursuing registration with the U.S. Patent and Trademark Office of the name "Colors+ Counseling" or any derivation of the name "Colors+" or "Colorsplus"; (v) prohibiting Defendants from representing to any person or entity that Colors+ is defunct or otherwise not providing services to the LGBTQ+ community; (vi) prohibiting Defendants from misrepresenting themselves as providing services other than for profit; (vii) prohibiting Defendants from accepting

any donations, grants or perquisites intended for any non-profit organization, including without limitation, Colors+; and (viii) requiring Defendants to assist reasonably in the reinstatement of Colors+ websites and social media sites. (*Id.* at PageID #72–73.)

On February 5, 2025, the Court conducted a telephonic status conference with the Parties to set a pre-hearing discovery schedule and to set a hearing on Colors+'s Motion. (*See* 2/5/2025 Entry.) On February 10, 2025, Defendants filed their Opposition Brief to Colors+'s Motion. (Doc. No. 15.) On February 17, 2025, Colors+ filed its Reply Brief in support of its Motion. (Doc. No. 17.)

The Court conducted the hearing on the Motion on two dates, March 28, 2025 and April 8, 2025. (*See* 3/31/2025 Entry and 4/9/2025 Entry.) At the hearing, the Court heard argument from the Parties' counsels, as well as testimony from Colors+'s witnesses (Colleen Cronin, Peter Finnerty, and Shannon Scott-Miller), and Defendants' witnesses (Kameron Pepera, Erin DiVincenzo, and Lennon Pepera). (*See* 3/28/2025 Hearing Tr.; 4/8/2025 Hearing Tr.) The Parties requested, and the Court granted, permission to file supplemental briefing to incorporate the evidence and testimony from the hearing into the briefs. (*See* 4/8/2025 Hearing Tr., 383:16-25.) On April 24, 2025, the Parties each filed their Supplemental Briefs. (Doc. Nos. 30, 31.)

## III. Legal Standard

When considering a motion for preliminary injunction, the Court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *See National Credit Union Administration Board v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th

Cir. 2007).  *See also Palmer v. Harris*, 2018 WL 6062305 at *6 (N.D. Ohio Nov. 20, 2018).  These factors should be balanced against each other but are "not prerequisites that must be met." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  *See also Avery Dennison Corp. v. Juhasz*, 924 F.Supp.2d 893, 899 (N.D. Ohio 2013).

 A party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances.  *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## IV.    Analysis

The Court will consider each of the four preliminary injunction factors separately, as applied to Colors+'s service mark infringement and false designation claims, below.[20]

### A.    Likelihood of Success on the Merits

First, the Court considers whether Colors+ "has demonstrated 'a strong likelihood of success on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 543 (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so

---

[20] As noted by Colors+, "[t]he test for false designation or misrepresentation under Section 43(a) of the Lanham Act … is essentially the same as that for service mark infringement." *JTH Tax, Inc. v. Freedom Tax, Inc.*, 2019 WL 2057323, at *4 (W.D. Ky. Mar. 15, 2019).

serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

Section 43(a) of the Lanham Act[21] provides a private cause of action for violations of protected trademark rights:

> "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof … which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C. § 1125(a)(1)(A). "The Lanham Act provides the Court with the power to issue an injunction to prevent trademark infringement 'according to the principles of equity and upon such terms as the court may deem reasonable.'" *Noco Co. v. Mac Calabur Investments, LLC*, 2022 WL 2176540, at \*4 (N.D. Ohio June 16, 2022) (citing 15 U.S.C. §§ 1116(a), 1125(c)(2)). "In the Sixth Circuit, '[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.'" *Id.* (citing *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006)).

"The test for false designation or misrepresentation under Section 43(a) of the Lanham Act … is essentially the same as that for service mark infringement." *JTH Tax, Inc. v. Freedom Tax, Inc.*, 2019 WL 2057323, at \*4 (W.D. Ky. Mar. 15, 2019). "[T]he same factors are considered under section 1125(a) as are considered under section 1114." *National Ass'n For the Advancement of Colored People, Nat. Office v. NAACP, Cincinnati Branch*, 2015 WL 4164696, at \*3 (S.D. Ohio July 9, 2015)

---

[21] *See* 15 U.S.C. § 1125.

(citing *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996)).

"A party proves trademark infringement by showing (1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'" *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (citing *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007)). "The touchstone of liability … is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997).

Here, the Parties dispute the first and third factors:[22] who owns the Mark at issue; and whether the concurrent uses of the Mark by Colors+ and Counseling is likely to cause confusion. The Court will address these factors below.

### 1.      Ownership of the Mark

The Court begins with the issue of who owns the Mark.

---

[22] As to the second factor, the Court acknowledges Defendants' position that Colors+ permitted Counseling to utilize the Mark from 2018 until 2024. However, there is no dispute that as of today, Counseling is *currently* utilizing the Mark without the permission of Colors+. (*See* 4/8/2025 Hearing Tr., 317:14-318:19.) Thus, the Court finds that there is no true dispute as to this second factor. Rather, Defendants' position on this point is better addressed within the context of Defendants' affirmative defenses—namely, whether Colors+'s alleged acquiescence of such use since 2018 prohibits it from now obtaining the injunctive relief it seeks. Accordingly, the Court addresses Defendants' arguments in its discussion below regarding acquiescence, rather than with respect to this second factor.

**a)      Findings of Fact Regarding January 2021 Board Meetings**

As a preliminary matter, the Court addresses the differing narratives offered by the Parties regarding the January 2021 Board meeting.  These two narratives are set forth above and will not be repeated here.  *See* Section I.B.3.

The Court finds Colors+'s narrative to be more credible for the following reasons.

First, the Court highlights that despite including significant details about other topics, neither the November 2020 Board minutes nor the January 2021 Board minutes mention anything regarding trademarking the Mark—let alone trademarking it in Counseling's name.  (*See* Doc. No. 27-1 at PageID #871–79.)  Nor does the Google Meet chat associated with the January 2021 Board meeting include any mention thereof.  (*Id.* at PageID #880–84.)

Second, the Court finds Finnerty and Scott-Miller to be more credible than Kameron and Lennon with respect to the events that occurred during the January 2021 Board meeting.  (*Compare* 3/28/2025 Hearing Tr., 128:5-20, 169:12-170:5; *with* 4/8/2025 Hearing Tr., 266:5-267:23, 358:21-359:11.)

Third, both Cronin and Scott-Miller independently testified that Kameron had informed them, at a meeting with others, that Colors+ owned the Mark.  The Court finds such testimony more compelling than Kameron's purported explanation of that meeting.  (*Compare* 3/28/2025 Hearing Tr., 42:4-11, 44:6-10, 170:6-11; *with* 4/8/2025 Hearing Tr., 272:1-17.)

Fourth, the Court finds it telling that in February 2021, Kameron indicated to her attorney that the "cost with you doing pro bono *might not be approved by our board*."  (Doc. No. 27-1 at PageID #762).  The Court thus draws the inference from this message that Kameron had not yet had that discussion with the Board as she so claims.  (*Id.*)

30

Finally, the Court notes that the Redesign Invoices from Kogan for redesigning the original logo into the Mark list "Colors+ Youth Center" as the client and use a "Friends & Family *Nonprofit* rate of $30/hour." (Doc. No. 27-1 at PageID #701–03.) The Court finds that such invoices support Colors+'s narrative that the Peperas had been representing to the Board that Colors+ owned the Mark.

Accordingly, the Court adopts Colors+'s narrative as to the events surrounding the January 2021 Board meeting and events pertaining to the Board's understanding—and the Peperas' representations—as to the ownership and trademarking of the Mark. *See supra* Section I.B.3.a.

### b) First Use of Mark

In its Motion, Colors+ asserts that it is the "rightful owner of the mark registered by Counseling and [Kameron]." (Doc. No. 5 at PageID #79.) Colors+ contends that it was the "first to use the mark in commerce to advertise its services to LGBTQ+ youth." (*Id.*) Colors+ maintains that Kameron, while owing a fiduciary duty to Colors+, "never informed the Board that Colors+ did not own the mark," "repeatedly affirmed that the mark belonged to Colors+," and "watched as Colors+ cultivated goodwill around the mark Counseling later claimed as its own." (*Id.* at PageID #79–80.) Colors+ asserts that Counseling's federal registration of the Mark "merely serves as prima facie evidence of ownership" and "is nothing more than a rebuttable presumption," given that "ownership rights flow only from prior appropriation and actual use in the market"—as Colors+ claims to have done here.[23] (*Id.* at PageID #79.)

---

[23] Colors+ also contends that the Trademark Application filed by Counseling and Kameron was fraudulent. (Doc. No. 5 at PageID #80.) However, the Court declines to reach this question at this time considering its conclusion that Colors+ owns the Mark based on its prior use, notwithstanding whether the Trademark Application was fraudulent. *See also infra* note 58; (Doc. No. 31 at PageID #1029 ("[A]lthough Colors+ believes it proved fraudulent registration, Plaintiff will leave that argument for later.").

In their Opposition, Defendants contend that they filed the Trademark Application on March 24, 2021, and received notice of the Trademark Registration on February 22, 2022.  (Doc. No. 15 at PageID #188.)  Defendants thus assert that Colors+'s claim "depends on its ability to show—by clear and convincing evidence—that it was the first to use the Mark in commerce."  (*Id.* at PageID #188– 89.)  Defendants argue that even if Colors+ established first use, "any prior use of the mark by [Colors+] inures to the benefit of Counseling" under the Lanham Act's "related companies" doctrine.[24]  (*Id.* at PageID #189.)

In its Supplemental Brief, Colors+ relies on evidence from the hearing in support of its claim of first use of the Mark.  First, Colors+ asserts that it used the Mark in commerce as early as January 11, 2021, in a Facebook post announcing the newly updated Mark.  (Doc. No. 31 at PageID #1030 (citing Doc. No. 27-1 at PageID #692; 3/28/2025 Hearing Tr., 49:4-7).)  Next, Colors+ contends that the "Mark, and the services it represents, have crossed state lines" given that "Colors+ has received many out-of-state (and some international) donations via its website which features the Mark."  (*Id.* (citing 3/28/2025 Hearing Tr., 50-51; Doc. No. 27-1 at PageID #693–99).)  Colors+ also asserts that it routinely includes the Mark in letters of intent, grant reports, applications, and invoices, including those sent to national grantors, and provides various examples.  (*See id.* (citing 3/28/2025 Hearing Tr., 51:14-52:7, 183:21-184:15; Doc. No. 27-1 at PageID #700).)  Further, Colors+ submits that "[o]ut-of-state youth have participated in Colors+'s virtual programming via its website.  (*Id.* (citing 3/28/2025 Hearing Tr., 52:9-11).)  Finally, Colors+ asserts that it has used the Mark to promote its services at all the events it attends and to contract with an out-of-state university and with out-of-state

---

[24] Defendants' Supplemental Brief also focuses primarily on the "related companies" doctrine with respect to the issue of ownership of the Mark.  (Doc. No. 30.)  This argument will be addressed further below.

speakers for its events. (*Id.* at PageID #1030–31 (citing 3/28/2025 Hearing Tr., 52:12-53:4, 171:14-172:12).)

"In the Sixth Circuit, trademark or service mark ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market." *Bodine Perry, PLLC v. Bodine*, 667 F. Supp.3d 617, 628 (N.D. Ohio Mar. 31, 2023) (citing *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 356 (6th Cir. 1998)) (alterations omitted); *see also Plastics NYC, LLC v. Plastics Boutique, LLC*, 2024 WL 3933750, at *6 (N.D. Ohio Aug. 25, 2024) ("Rights in a trademark are determined by the date of the mark's first use in commerce.") "Federal registration of a service mark serves as *prima facie* evidence of ownership, and places the burden on the opposing party to show prior appropriation and *continued use* of a mark." *Bodine*, 667 F. Supp.3d at 628 (citing *Allard*, 146 F.3d at 356–57). In other words, "[t]he priority determination focuses on whether the accused party established a bona fide prior use of the mark, as opposed to an intention to use the mark." *Oatly AB v. D's Naturals LLC*, 2022 WL 1651620, at *14 (S.D. Ohio May 24, 2022) (citing *Allard*, 146 F.3d at 356).

"The crux of this analysis is whether the party used the mark in commerce." *Bodine*, 667 F. Supp.3d at 628 (citing *Allard*, 146 F.3d at 357). "A mark shall be deemed to be use[d] in commerce … on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce …" *Id.*; *see also* 15 U.S.C. § 1127. "While federal registration of a trademark grants nationwide priority as of the filing date of an application for registration, … the registrant's rights are always subject to any superior common law rights acquired by the senior user of a mark." *Plastics NYC, LLC*, 2024 WL 3933750, at *6 (citing *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001)) (internal quotation marks omitted). "The first to use a

33

mark in commerce is the 'senior user' and obtains common-law ownership in the geographic area where the mark is used—even if the use of the mark is not extensive and does not result in widespread recognition." *Id.*

In this case, Defendants filed their Trademark Application on March 24, 2021. (Doc. No. 27-1 at PageID #677.) Defendants' Trademark Registration thus serves as *prima facie* evidence of ownership. Accordingly, as acknowledged by Defendants,[25] Colors+'s claim depends on its ability to show that it was the first to use the Mark in commerce.

The Court finds that Colors+ has sufficiently put forth evidence demonstrating a strong likelihood of success that it was the first to use the Mark in commerce.[26] First, Colors+ provides a specific Facebook post, dated January 11, 2021, in which the new Mark was debuted.[27] (Doc. No. 27-1 at PageID #692.) The Facebook post also included advertisements for Colors+'s services,

---

[25] (Doc. No. 15 at PageID #188–89.)

[26] In their Opposition, Defendants assert that Colors+ had not demonstrated that it had ever used the Mark in *interstate* commerce or that Counseling's use of the Mark has had a substantial effect on interstate commerce, and that Defendants planned to seek discovery on the issue. (Doc. No. 15 at PageID #189.) Later, during the hearing, Defendants' counsel acknowledged that both Counseling and Colors+ engaged in interstate commerce. (*See* 3/28/2025 at Hearing Tr., 116:8-10 ("Did Counseling and/or Colors+ engage in interstate commerce? And I think the answer to that is undoubtedly yes. We have no issue stipulating to that.").) Defendants' counsel then indicated that their disputed issue was "whether the alleged infringement has any impact on interstate commerce." (*Id.*) The Defendants did not raise this point in their Supplemental Brief, and it is unclear to the Court whether Defendants have abandoned this issue.

To the extent that Defendants still advance this argument, the Court rejects it for two reasons. First, as noted in Plaintiffs' Supplemental Brief, "[i]t is now well settled that federal courts have jurisdiction under the Lanham act over *both* (1) infringing acts that take place across or have a demonstrable contact with state lines *and* (2) intrastate acts of infringement or federal unfair competition that have a substantial effect on interstate commerce or on plaintiff's interstate business." *See* 1A Gilson on Trademarks § 3.03(3) (emphasis added). In other words, only one of the two categories is required to establish jurisdiction. Second, based on the totality of evidence presented at the hearing, the Court finds that Colors+ has sufficiently demonstrated both categories. (*See, e.g.*, 3/28/2025 Hearing Tr., 102:12-103:4; 4/8/2025 Hearing Tr., 320:17-322:14.)

[27] Specifically, the Facebook posted provided, in relevant part: "New Year, New Updates for Colors+! Check out our newly updated and more inclusive logo, revamped website at www.colorsplus.org, and our new newsletter! Updated Logo by Sabrina Kogan." (Doc. No. 27-1 at PageID #692.) Further, the Court finds it to be irrelevant whether Kameron was the user who ultimately made the post because even if so, she did so as an agent, and on behalf, of Colors+.

including a list of schedule "Programming" as well as "Upcoming Virtual Programming." (*Id.*)  And Colors+ has continued using the Mark ever since.  The Court thus finds that the Mark was sufficiently "used in commerce" in that the Mark was used for "advertising of services" of which were "rendered in commerce."  *See* § 1127.  Second, Cronin testified that this Facebook post was "like the debut, the premiere, the public announcement" of the new Mark—thereby supporting the notion that it was used in commerce by Colors+ prior to any use by Counseling.  (*See* 3/28/2025 Hearing Tr., 49:4-7.)  Third, Finnerty testified that Colors+ had been using the Mark to advertise its nonprofit services "since the creation of the logo."  (*See id.* at 131:19-24.)

Finally, and notably, Counseling's Trademark Application lists the "first use in commerce date" as "[a]t least as early as 01/00/2021"—in other words, January 2021 with no specific day of the month listed.  (Doc. No. 27-1 at PageID #678.)  Because Counseling did not provide a specific day in January for the date of first use, the Court presumes the date is the last day of the month.  *See* Trademark Manual of Examining Procedure, § 903.06 Indefinite Dates of Use (last revised Nov. 2024) ("The only date that will be recognized for USPTO proceedings is the latest definite date specified by the applicant … When a month and year are given without a specified day, the date presumed for purposes of examination is the last day of the month.").  Thus, Counseling's alleged first use in commerce date is January 31, 2021, as referenced in its Trademark Application, and is thus after the first use by Colors+ in its Facebook post dated January 11, 2021.  (Doc. No. 27-1 at PageID #692.)

The Court thus finds that Colors+ has set forth sufficient evidence to rebut Defendants' *prima facie* evidence of ownership created by the Trademark Registration.  Accordingly, Colors+ has

demonstrated a strong likelihood of success on the merits with respect to its claim of first use of the Mark.

### c)     Related Companies Doctrine

The Court next turns to Defendants' arguments regarding the "related companies" doctrine.

In their Opposition, Defendants submit that even if Colors+ establishes itself as the first user of the Mark, such first use inures to the benefit of Counseling under the Lanham Act's "related companies" doctrine.  (Doc. No. 15 at PageID #189.)  Defendants assert that the related companies doctrine permits a registrant to establish ownership of a mark by showing that it controlled the first user of the mark.  (*Id.*)  Thus, Defendants contend that the Peperas exercised control over the nature and quality of Colors+'s services, and that as a result, Colors+ and Counseling "are related companies … and to the extent that [Colors+] engaged in any prior use in commerce, that first use inures as a matter of law to the benefit of Counseling, the applicant and eventual registrant of the [M]ark."  (*Id.*)

In their Supplemental Brief, Defendants cite to evidence adduced during the hearing in support of this argument.  Defendants contend that the evidence presented demonstrates that Counseling and Colors+ "operated like a single enterprise, with common leadership, operating out of the same building, and even using the same phone number."  (Doc. No. 30 at PageID #1011.)  Defendants assert that the Peperas controlled Colors+ from its inception and that Colors+ "was always intended to work as a compliment to Counseling."  (*Id.* at PageID #1014.)  Defendants assert that Lennon and Kameron "were really the only ones using the trademark within both entities."  (*Id.* at PageID #1015.)  Defendants also contend that "the 'brand' that the Peperas created, fostered, and promoted was comprehensive clinical and non-clinical support for LGBTQ+ youth, overseen by licensed mental health professionals … a 'two-for-one organization …'"  (*Id.* at PageID #1016.)

36

Defendants maintain that it was the Peperas presence and Colors+'s connection to Counseling that gave credibility, goodwill, and value to the brand," and that the Peperas "were also responsible for staffing the programs and did so either personally or through clinical interns under their supervision." (*Id.* at PageID #1016–17.)

Defendants assert that Kameron developed Colors+'s website and maintained its social media pages, while Lennon managed the marketing for Colors+, contributing to its social media presence. (*Id.* at PageID #1017.) Defendants also note that "in January of 2021,[28] Lennon revised the logo … to add a component of the Progress flag into the plus sign," "Kameron contacted Sabrina Kogan to create a digital version," and the Peperas "presented the new logo to the Board and indicated that both organizations could use it, just as both organizations had used the prior logo." (*Id.*) Finally, Defendants point to Colors+'s concession that Kameron and Lennon were running both Colors+ and Counseling, and that the Colors+ Board was not in-charge of day-to-day operations or supervising every instance of the Mark which was Kameron's job. (*Id.* at PageID #1018.)

In their Reply, Colors+ argues that Colors+ and Counseling are not "related companies" under the Lanham Act. (Doc. No. 17 at PageID #229.) Colors+ asserts that as of February 2021, the Peperas

---

[28] Defendants also reference Lennon designing the original logo back in 2018. (Doc. No. 30 at PageID #1017.) However, the Court instead focuses on the January 2021 events for three reasons. First, the specific Mark at issue in this case is the updated Mark that contains the progress flag—which did not exist until January of 2021. Second, as noted by Colors+, "[t]he related companies doctrine does not apply where the trademark at issue is not registered, except where an application to register it has been filed." *See* 2 Gilson on Trademarks § 6.04(3)(b)(ii) (citing cases). Third, as explained previously by the Court, the first use of this updated Mark occurred by Colors+ in January of 2021. *See* Section IV.A.1.a.

were "employed by Colors+ in fiduciary positions[29] as executive director and deputy director."[30] (*Id.*) Colors+ contends that Counseling never controlled Colors+'s use of the Mark, and that although Kameron "may have handled Youth Center programming and decided how the mark would be used, … she did so as the paid executive director of Colors+, not as a representative of Counseling." (*Id.* at PageID #231.) Accordingly, Colors+ maintains that it "never agreed that Counseling owned the mark or that the mark was licensed to Colors+ at the whim, and subject to the control, of Counseling." (*Id.* at PageID #231–32.)

In their Supplemental Brief, Colors+ reiterates that any instances of the Peperas "controll[ing] the quality of the services Colors+ rendered in connection with the Mark" only occurred "because the Peperas were paid by Colors+ to do so." (Doc. No. 31 at PageID #1040.) Specifically, Colors+ asserts that "[a]ny 'quality control' the Peperas exercised over Colors+'s services was done as paid fiduciaries of Colors+ and performed in furtherance of Colors+'s mission — not on behalf of Counseling." (*Id.*) Finally, Colors+ points to Kameron's testimony that Counseling allegedly gave Colors+ "blanket permission" to use the Mark—which Colors+ contends undermines the Peperas' "claimed exercise of quality control over services represented by the Mark." (*Id.*)

---

[29] Indeed, at the hearing, Kameron was asked whether her and Lennon owed Colors+ fiduciary duties in January 2021 (i.e., the time in which they served as executive director and deputy director), to which Kameron responded, "Yes." (*See* 4/8/2025 Hearing Tr., 278:2-5.) While the Court recognizes that the Parties have not yet conclusively litigated the fiduciary duty issues raised in Colors+'s Verified Complaint, the Court finds that this testimony—at a minimum—reflects Kameron's state of mind in the sense that she *believed* that she owed such duties to Colors+.

[30] Colors+ also asserts that the Peperas "admittedly violated their fiduciary duties if, as they assert, they had 'discussions … with fellow board members … and made it clear that … Counseling would be registering the trademark.'" (Doc. No. 17 at PageID #229.) However, as explained below, the Court finds Colors+'s version of the January 2021 Board meeting—namely, that trademarking the Mark was not discussed at the meeting—to be more credible and therefore it does not need to address this argument further. Finally, Colors+ contends that Counseling has confused the public by using the Mark in connection with for-profit services, and thus, the related companies doctrine does not apply. (Doc. No. 17 at PageID #230–31.)

38

As explained above, "[o]rdinarily, a party establishes ownership of a mark by being the first to use the mark in commerce." *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1347 (D.C. Cir. 2008) (citing *Allard*, 146 F.3d at 358).   However, "[u]nder the doctrine of 'related companies,' the first use of a mark by a person 'controlled by the registrant or applicant for registration of the mark' shall inure to the benefit of the controlling entity." *Id.* (quoting 15 U.S.C. § 1055); *Secular Organizations for Sobriety, Inc. v. Ullrich*, 213 F.3d 1125, 1131 (9th Cir. 2000).

The Lanham Act sets forth the related companies doctrine as follows:

"Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.   If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be."

15 U.S.C. § 1055.   The Lanham Act further defines a "related company" as "any person[31] whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."   15 U.S.C. § 1127.

To acquire ownership of a mark through a related company's use, the "statute does not expressly require formal corporate control." *Coll-Monge*, 524 F.3d at 1348; *Bon Vivant Catering, Inc. v. Duke Univ.*, 2016 WL 3149725, at *7 (M.D.N.C. June 3, 2016).   Rather, the "statute requires control over only the use of a mark … with respect to the nature and quality of the goods or services, which may include not only corporate control but also licensing agreements and other types of oversight." *Coll-Monge*, 524 F.3d at 1348; *Bon Vivant Catering*, 2016 WL 3149725, at *7.   If a

---

[31] A "person" as defined in the Lanham Act includes both a natural person as well as a juristic person (i.e., a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law).   *See* 15 U.S.C. § 1127.

related company uses the mark, "the party who controls the nature and quality of the goods or services with which the mark is used is the owner of the mark, and should be the applicant for registration of that mark." *Bon Vivant Catering*, 2016 WL 3149725, at *7.

Defendants rely on *Coll-Monge* in support of their position. In *Coll-Monge*, the decedent had founded two non-profit entities and three for-profit entities. 524 F.3d at 1344. The decedent was the president of each of the non-profits as well as on the board of directors of each, and exclusively owned all the for-profit companies. *Id.* at 1344–45. The entities operated in tandem to promote the decedent's "Inner Peace Movement" self-actualization program. *Id.* at 1344. In relation to this program, the decedent registered five service marks with the USPTO—all of which were registered in his personal name. *Id.* at 1345. In 1999, the decedent passed away. *Id.* Two years later, his estate, joined by the for-profit entities, filed suit against the non-profit entities challenging ownership of the registered service marks. *Id.* It was undisputed that the non-profit entities were the "first users" of the marks at issue, but the estate contended that the decedent "controlled" the non-profits' use of the marks, which use therefore inured to his benefit. *Id.* at 1347. The district court granted summary judgment in favor of the non-profits on the issue of ownership. *Id.* at 1346.

On appeal, the appellate court reversed the summary judgment, concluding that the estate had presented sufficient evidence to put into dispute "whether or not [the decedent] controlled the use of the Non-Profits' marks from the marks' first use." *Id.* at 1349. First, the court relied on testimony indicating that "[w]hile there was a Board of Directors, [the decedent] was always in complete control of [the non-profit] and its use of the mark." *Id.* at 1348. Evidence of this complete control included an affidavit indicating that the decedent "shut[] down the Board of Directors" and kept the non-profit "dormant for 4-5 years." *Id.* As another example of this complete and extreme control, the court

40

noted that the non-profit later amended its by-laws to provide that the decedent would "have an absolute and overriding power of veto on any decision made by the Executive Committee at all times and in all circumstances." *Id.* at 1349 n. 6.  Further evidence was presented that the decedent "controlled the use of the … mark and merchandizing through multiple distribution channels," and that such control "extended even to … giving specific permission for each traveling leader and lecturer as to their use of the mark in merchandizing their lectures and courses." *Id.* at 1348.

Finally, the court relied upon letters that the decedent had written to the USPTO in response to requests for "clarification" of his trademark registration applications. *Id.* at 1348–49.  These letters expressly acknowledged that "[t]here exists a verbal understanding between the applicant and the non-profit that any and all materials … be reviewed and approved by the applicant prior to use by the [non-profit], which mark is the logo for said corporation." *Id.* at 1349.  Based on the above, the court remanded for further proceedings because a genuine dispute of fact existed as to whether the decedent controlled the trademarks under the related companies doctrine. *Id.* at 1349–50.

The Court finds the present case to be factually distinguishable from *Coll-Monge*.  In *Coll-Monge*, the decedent had complete and total control over every aspect of the non-profits and their uses of the marks—so much so that he "shut[] down the Board of Directors," made the non-profit dormant for years, required each traveling leader and lecturer to receive specific permission from him with respect to the mark, and enacted an "absolute and overriding power of veto" for himself over any decision made by the board. *Id.* at 1348–49.  In essence, the decedent himself was the non-profits, and did not answer to anyone.  Yet here, by contrast, Kameron and Lennon both carried out their duties as paid employees at the behest of the Colors+ Board.

41

The evidence presented at the hearing showcases this.  First, the Board was extensively involved in discussions regarding how the new Mark would be designed,[32] and the final Mark was brought before the Board "to say that the [B]oard approved of it."  (*See* 3/28/2025 Hearing Tr., 169:5-17.)  This demonstrates Board involvement and authority with respect to the Mark—including discussions and approval as to redeveloping the Original Logo to be more inclusive, which goes towards its "use" and brand development in the community.  Second, Cronin's testimony included examples of her providing such guidance and recommendations to Kameron with respect to the branding of the organizations, including the need for separation between the entities.  (*See id.* at 37:18-38:23.)  Most notable is Cronin's testimony that Colors+ had formed a marketing committee to address the concerns of the Board regarding branding—which includes how the Mark is used:

> Q: So that's one example of a recommendation you made to Kameron?
> A: Yes.
> Q: And were any of your recommendations implemented?
> A:  We had started with that.  We had formed a marketing committee.  So we had started updating our marketing assets and things like that to make that delineation clear, but that's a very long process with a nonprofit.  Involves a lot of, you know, redoing of websites and all of those things and redoing language and brochures.  And all of that which, of course, is very costly, but we also had a volunteer designer, who was actually a specialist in branding, who was donating their services … to work on those assets for us.

(*Id.* at 38:10-23.)  This constitutes direct evidence of the Board's involvement in controlling the use of the Mark.

Considering this evidence, the Court finds that Colors+ has demonstrated a likelihood of success in showing that it owned the Mark at issue.  Unlike *Coll-Monge*, this case does not present the same type of unfettered control that the decedent exercised over the non-profits and marks at

---

[32] Notably, the Redesign Invoices provided by Kogan for such redesign "Colors+" as the client—not the Peperas or Counseling.  (*See* Doc. No. 27-1 at PageID #701–03.)

issue.  Indeed, in addition to requiring specific permission for any leaders of the non-profits to use the marks, the decedent in *Coll-Monge* was "always in complete control" of the non-profits and even "shut[] down the Board of Directors"—whereas in this instance, it was the Colors+ Board that ultimately "shut down" Kameron by terminating her employment for alleged misfeasance.  (*See* Doc. No. 1 at PageID #5.)  Whereas the non-profits in *Coll-Monge* were unilaterally controlled by the decedent without any other oversight, Colors+ here operated under the guidance of its Board, whose general directives were implemented by its paid executive director.[33]

Moreover, the Court is not persuaded by Defendants' assertions regarding Kameron's role at Colors+.  Specifically, Defendants describe Kameron as running the day-to-day operations of Colors+ which included using the Mark.  (*See* Doc. No. 30 at PageID #1017–18.)  However, Kameron was doing so as a paid employee of Colors+—and thus not on behalf of Counseling.  (*See* 4/8/2025

---

[33] The Court notes that even in *Coll-Monge*, the Court did not affirmatively conclude that the facts presented demonstrated that the related companies doctrine applied—rather, the court simply found that enough evidence existed to "put in dispute whether or not [the decedent] controlled the use of the Non-Profits' marks from the marks' first use."  524 F.3d at 1349.  Accordingly, because there "remain[ed] disputes issues of fact regarding whether [the decedent] controlled the trademarks under the related companies doctrine and in what capacity he registered the marks," the court concluded that "neither the Estate nor the Non-Profits are entitled to summary judgment."  *Id.* at 1350.  Accordingly, the court reversed the previous summary judgment granted in favor of the non-profits and remanded to the district court for further proceedings on those factual disputes.  *Id.*  Here, by contrast, as the finder of fact that presided over the hearing, the Court can and hereby does resolve the genuine disputes of fact—unlike in the summary judgment context.

Defendants also rely on *Bon Vivant Catering, Inc.*, and for similar reasons, the Court finds the present case to be distinguishable.  2016 WL 3149725.  First, that case also involved a summary judgment motion and the court, upon "viewing the evidence in the light most favorable to Plaintiff as the non-moving party" ultimately concluded that the defendant had "failed to show as a matter of law that [the applicant] lacked the requisite control over [the allegedly related company] to establish her ownership of the mark."  *Id.* at *7.  Here, Counseling is not entitled as the non-moving party to have the evidence viewed in the light most favorable to it as is the case in the context of a summary judgment motion—rather, the Court may resolve any issues of fact as the factfinder.  Second, the Court finds the facts of *Bon Vivant Catering* to similarly demonstrate more complete control than seen here, including that the applicant had served as the president of the for-profit company and controlling shareholder, and singlehandedly handled the mark at issue without any other oversight.  *Id.*  Finally, in *Bon Vivant Catering*, the purportedly "related company" was not the one challenging the applicant to ownership.  Rather, an unrelated third-party was sued by the applicant who had registered the mark in her individual name based on her use of it through her own company, and thereafter, the third-party argued that the applicant's registration should be canceled because it was technically her company that owned the mark and not her.  *Id.* at *5.  The Court finds such facts distinguishable from the present case, in which the purportedly "related company" *itself* is claiming ownership of the Mark against the individual who allegedly "controlled" it.

Hearing Tr., 265:8-20.)  Further, the mere fact that Cronin testified that the Colors+ Board was not in-charge of day-to-day operations or supervising every instance of the Mark does not mean that the Board did not ultimately control and oversee Colors+ and its use of the Mark.  (*See* 3/8/2025 Hearing Tr., 90:5-10.)  Indeed, such an assertion is undermined by the fact that the Board formed a marketing committee to guide and oversee the general branding of the organization.  (*Id.* at 38:13-23.)  Kameron's duties were thus exercised at the behest of the Board.  To hold otherwise would essentially require every board of directors to operate as a full-time marketing team to retain ownership over its service marks.  In other words, under Defendants' view, any employee in an organization who was hired and paid to perform the specific job of directing the marketing and services of the organization would be permitted to strip the entity and board of directors of any such service marks used in connection therewith under a claim of "control"—even if the entity itself had created and paid for those service marks.[34]  The Court declines to find as such.

Finally, and importantly, the Court notes that any purported lack of "direct" supervision of the Mark by the Board—as Defendants assert—must be viewed within the context of the misrepresentations made regarding the Mark.  First, with respect to the January 2021 Board meeting, the Court finds Colors+'s assertions credible that it was never disclosed to the Board that Counseling intended to own or register the Mark.[35]  Moreover, at a Colors+ meeting in which Counseling was never mentioned, when asked directly whether "we actually held the trademark," Kameron responded that the "trademark was registered and that we [Colors+] owned it."  (*Id.* at 42:4-8, 44:6-10, 44:16-

---

[34] (*See* Doc. No. 27-1 at PageID #701–03 (listing Colors+ as the client as to the creation of the Mark); 3/28/2025 Hearing Tr., 94:21-25, 101:16-18.)

[35] *See supra* Sections I.B.3.a, IV.A.1.a.

17; *see also id.* at 170:6-11.) In other words, the Board never had a need to directly micromanage the use of the Mark because it was their understanding that the Mark was already being properly managed on behalf of Colors+ and its interests. (*Id.* at 42:5-6; 44:6-8; 79:23-24; 129:11-130:12; 169:24-170:11; 187:6-19.) The Board was led to believe, by Kameron's representations, that Colors+ owned and registered the Mark, and thus, the only additional actions needed was to provide general guidance as to the use of the Mark in connection with Colors+'s services—to which the Board created a marketing committee and frequently discussed with Kameron how the Mark should be appropriately utilized. (*See, e.g.*, *id.* at 37:18-38:23.) It would be unreasonable to penalize the Board for not taking a more "hands-on" role in the day-to-day control of the Mark where they believed that Kameron, in her role as executive director, was already doing so in furtherance of the Board's general directives.

Accordingly, the Court finds that Colors+ has demonstrated a likelihood of success in showing that the related company doctrine is inapplicable here, and thus, that Colors+ owns the Mark pursuant to its first use. *See* Section IV.A.1.b.

### 2. Likelihood of Confusion

The Court next turns to the issue of whether Counseling's use of the Mark "is likely to cause confusion among consumers regarding the origin of the [services] offered by the parties." *Coach, Inc.*, 717 F.3d at 502.

In the Sixth Circuit, courts consider eight factors (the "*Frisch*" factors) when evaluating whether there is a likelihood of confusion:

> (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines or services.

45

*AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264-65 (6th Cir. 2021) (citing *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016)).  According to the Sixth Circuit, "[t]his inquiry presents a mixed question of fact and law—it 'has factual components (e.g., what evidence of confusion has been shown?) and legal components (e.g., what counts as cognizable confusion?).'" *Id.* (quoting *Sterling Jewelers, Inc. v. Artistry Ltd.*, 896 F.3d 752, 755 (6th Cir. 2018)).

"These factors are meant to be 'helpful guides rather than rigid requirements.'" *Bliss Collection, LLC v. Latham Companies, LLC*, 82 F.4th 499, 509 (6th Cir. 2023).  Thus, "a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Champions Golf Club, Inc.*, 78 F.3d at 1116.  Ultimately, the question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.*; *Bliss Collection, LLC*, 82 F.4th at 509 (citing *Groenveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013)).

In both its Motion and Supplemental Brief, Plaintiff addresses all eight *Frisch* factors.  (Doc. No. 5 at PageID #83–86; Doc. No. 31 at PageID #1032–37.)  In their Opposition and Supplemental Brief, Defendants do not specifically address the individual *Frisch* factors.  Instead, Defendants generally assert that Colors+ has failed to produce evidence of Lanham Act confusion, and that any such confusion presented does not stem from the concurring use of the Mark but rather is "confusion in the ordinary sense occasioned by the sudden split between two entities that for the last six years, operated as a single enterprise, which had been run by the same people, out of the same building, with the same phone number."  (Doc. No. 15 at PageID #195; Doc. No. 30 at PageID #1021–23.)

The Court will address each of the eight *Frisch* factors below.

46

### a)        Strength of the Mark

The strength-of-the-mark factor "focuses on the distinctiveness of a mark and its recognition among the public." *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 427 (6th Cir. 2017) (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002)). A mark's strength is comprised of two components: conceptual strength and commercial strength. *AWGI*, 998 F.3d at 265 (citing *Kibler*, 843 F.3d at 1073).

### (1)        Conceptual Strength

To determine "conceptual" strength, courts classify trademarks in categories of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

"An arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached." *Bliss Collection, LLC*, 82 F.4th at 510.  In determining whether a mark is distinctive, the Sixth Circuit has held that "[c]olor may feature as a component of a trademark, especially where that color can limit the scope of the mark." *See id.* at 510–11 (finding unregistered mark to be inherently distinctive based not solely on its words but also because it included the distinct "color bliss Blue").

The Court finds that the Mark at issue here is an arbitrary mark.  In this case, the Mark at issue is not merely the words "Colors+."  Rather, it is the exact iteration of those letters colored in a particular manner—namely, with a rainbow coloring for each letter and symbol, combined with the distinctive "white, pink, blue, brown, and black flag" progress flag on the left side of the "+" sign. (*See* Doc. No. 27-1 at PageID #681.)  Moreover, the term "Colors+" alone has a "significance recognized in everyday life" in that it simply refers to colors in a general sense. *Bliss Collection,*

47

*LLC*, 82 F.4th at 510.  Yet such significance "is unrelated to the … service to which the mark is attached"—an LGBTQ+ youth center.  *Id.*  Based on both the distinctiveness of the Mark as limited by its specific design and the unrelatedness of Colors+'s services to "colors" in a general sense, the Court finds that the Mark at issue here is an arbitrary mark.[36]

Accordingly, the Court concludes that the Mark is conceptually strong.

### (2)  Commercial Strength

To determine "commercial" strength, courts examine a mark's public recognition and the extent to which people associate the mark with the product it announces.  *See Progressive*, 856 F.3d at 430 (citing *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012)).  A mark can be conceptually strong without being commercially strong, and thus, ultimately weak. *Id.*

In this case, Colors+ offered testimony from Finnerty—a "member of the [LGBTQ] community and someone who's very involved with the community"—that the Mark is "well known to people in the community here in Cleveland."  (*See* 3/8/2025 Hearing Tr., 131:13-16.)  Moreover, as noted by Colors+, "Defendants have presented no evidence to the contrary."  (Doc. No. 31 at PageID #1032.)  The Court thus finds that the Mark is commercially strong.

Accordingly, the Court concludes this factor weighs in Colors+'s favor.

---

[36] Indeed, as noted by Colors+, "Defendants have presented no evidence to the contrary."  (Doc. No. 31 at PageID #1032.) Finally, the Court notes that even if the Mark did not arise to the level of "arbitrary," it nevertheless warrants protection based on the secondary meaning developed "in the minds of the public," as explained further below.  *Hydrojug, Inc. v. Five Below, Inc.*, 625 F. Supp.3d 684, 700 (N.D. Ohio 2022) (Barker, J.); (*see* 3/28/2025 Hearing Tr., 131:9-24); *see also Champions Golf Club, Inc.*, 78 F.3d at 1118 ("If the district court determines that the mark is descriptive, it will be necessary for it to consider whether the mark has acquired secondary meaning, entitling it to protection under the Lanham Act.").

          **b)**       **Relatedness of the Goods**

In the Sixth Circuit, courts apply the following test to decide whether relatedness favors either party: "1) if the parties' products compete directly with each other, consumer confusion is likely if the parties' marks are sufficiently similar; 2) if the products are somewhat related, but do not compete directly, the likelihood of confusion will depend on other factors; 3) if the products are completely unrelated, confusion is unlikely." *Kibler*, 843 F.3d at 1076 (citing *Daddy's Junky Music Stores*, 109 F.3d at 282). Services and goods "are 'related' not because they coexist in the same broad industry," but because they "are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *AWGI, LLC*, 998 F.3d at 266; *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991). However, just because there is "some overlap between the two services, it does not follow that the companies compete directly for the same base of customers." *Progressive*, 856 F.3d at 432. Rather, "[t]he question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Homeowners Grp.*, 931 F.2d at 1109.

The Court finds that the Parties "compete directly with each other." *Kibler*, 843 F.3d at 282. At the hearing, Cronin testified to various services offered by Counseling that compete with Colors+. (*See* 3/28/2025 Hearing Tr., 63:5-64:20.) Particularly relevant is Cronin's testimony that Colors+ offers an after-school drop-in for youth called "Connections+", which is held on Wednesdays at 4:00 p.m. at the Youth Center. (*Id.* at 63:17-23.) After the fallout between the Parties, Counseling begin operating their own virtual drop-in on Wednesdays at 4:00 p.m.—the same time as Colors+'s

"Connections+" program.[37] (*Id.* at 63:24-64:4.) Similarly, Counseling also offers programs such as art and music therapy, again in competition with Colors+. (*Id.* at 64:5-20.) Because the Parties "compete directly with each other … [and] the parties' marks are sufficiently similar," this factor weighs in favor of Colors+. *Kibler*, 843 F.3d at 282.

Defendants assert that "[f]ar from being competitors, [Colors+] and Counseling were symbiotic, with both organizations led by the Peperas." (Doc. No. 15 at PageID #186.) However, the relevant issue is whether the entities *are currently* competitors in relation to their ongoing use of the Mark. Moreover, even if the Court concluded that Colors+ and Counseling were not competitors, the Court would nevertheless reach the same result because the services "are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *AWGI, LLC*, 998 F.3d at 266. As discussed further below, Colors+ has offered numerous examples of this. (*See, e.g.*, 3/28/2025 Hearing Tr., 59:5-12.)

Accordingly, the Court concludes this factor weighs in Colors+'s favor.

### c) Similarity of the Marks

According to the Sixth Circuit,

The more similar the marks are, the more likely it is that relevant consumers will confuse their sources. We determine the similarity of marks by considering whether either mark would confuse a consumer who did not have both marks before her and had only a vague impression of the other mark. *Daddy's*, 109 F.3d at 283. We consider the marks' pronunciation, appearance, and verbal translation. *Id.*; *see, e.g.,*

---

[37] The Court is not convinced by Kameron's testimony that because Counseling's program is "offered to all teens, not just trans or LGBTQ+ teens," it is distinguishable from, and therefore non-competitive with, Colors+'s "Connections+" program. (*See* 4/8/2025 Hearing Tr., 313:3-20.) Rather, the Court finds Colors+'s narrative to be more credible—namely, that Counseling began its program after the fallout between the Parties to directly compete with and undermine Colors+'s "Connections+" program.

> *Maker's Mark*, 679 F.3d at 421-22 (finding factor favors plaintiff because marks are facially similar and some companies offer several kinds of distilled spirits).
>
> The anti-dissection rule requires us not to dwell on the prominent features of a mark and instead consider it as a whole. *Little Caesar*, 834 F.2d at 571-72; *see, e.g., Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 423-24 (6th Cir. 1999) (finding distinctions in appearance, syllables, language, and pronunciation prevent "JET" and "AEROB–A–JET" from being confusingly similar despite their common word); *Little Caesar*, 834 F.2d at 572 (finding differences in sound, appearance, and syllables distinguish "Little Caesar" from "Pizza Caesar USA" despite the prominent word they share).

*Kibler*, 843 F.3d at 1077. Nevertheless, to discuss a mark's overall impression, courts often discuss the most salient features that give rise to a mark's overall impression in their analyses. *Flower Mfg., LLC v. CareCo, LLC*, 466 F. Supp.3d 797, 814 (N.D. Ohio 2020) (citing *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004), *Leelanau Wine Cellars*, 502 F.3d at 517).

In the present case, Colors+ and Counseling are using the same Mark or relevant portions of it. Although Defendants try to draw a distinction that "[n]either party is currently using the mark as registered," the Court is not persuaded. (Doc. No. 15 at PageID #187.) First, it is inconsequential whether only the "+" symbol of the Mark is being used as opposed to the entire Mark because courts look to the "most salient features that give rise to a mark's overall impression in their analysis." *Flower Mfg., LLC*, 466 F. Supp.3d at 814. There is no true dispute that the "+" symbol, with the associated rainbow coloring and progress flag, are part of the Mark's most salient features. (*See* Doc. No. 27-1 at PageID #681.) Second, at the preliminary injunction hearing, Kameron acknowledged that Counseling was using the exact Mark in some places. (*See* 4/8/2025 Hearing Tr., 318:9-19.)

Accordingly, the Court finds that this factor weighs in favor of Colors+.

#### d)       Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 284 (quotation omitted).  However, because such evidence is often hard to find, this factor "is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* (quotation omitted).  When evidence of confusion would be unexpected due to a small market or a recent act of infringement, a single instance of actual confusion can serve as strong evidence of potential future confusion. *See id.*; *Little Caesar*, 834 F.2d at 571-72 (recency explains lack of evidence of actual confusion); *Maker's Mark*, 679 F.3d at 422 ("it is reasonable that no meaningful evidence of actual confusion was available" because "the Reserva product was sold for a short time and in limited quantities").

On the other hand, merely "isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising" would not necessarily increase the likelihood of confusion, but rather may suggest confusion is unlikely.  *Daddy's Junky Music Stores*, 109 F.3d at 284; *see also Progressive Distrib.*, 856 F.3d at 434 (limited evidence of confusion despite mass advertising indicates actual confusion is presumptively unlikely); *Kibler*, 843 F.3d at 1078-79 (10 instances of confusion favor plaintiff only slightly, given massive sales and online interactions).

Other courts have found that social media posts can be anecdotal evidence of actual consumer confusion, including in similar preliminary injunction analyses.  *See, e.g., Hope Organics LLC v. Preggo Leggings LLC*, No. 21-CV-2416 (TMR), 2021 WL 5919367, at *8 (S.D.N.Y. Dec. 15, 2021) (noting that "it is not extraordinary in today's Internet age for consumers to communicate with brands in the form of online comments and reviews, and for parties to rely on such comments to present any

52

evidence of actual confusion."); *Heaven Hill Distilleries*, 575 F. Supp. 3d at 832 (concluding that the court had the "best evidence" of consumer confusion, including examples of "actual confusion in social and traditional media alike," including three examples from social media comments and posts); *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 2d 361, 378 (S.D.N.Y. 2018) (concluding that the plaintiff demonstrated evidence of actual consumer confusion based on two social media posts and a Yelp review).

Here, Colors+ has presented the Court with various evidence of consumer confusion.  First, Cronin testified that she has "continually had to explain to people … the difference, that the Counseling and the Youth Center are separate organizations, pretty much whenever I'm talking about the Youth Center."  (*See* 3/28/2025 Hearing Tr., 59:5-60:12.)  Further, Cronin provided examples of such confusion as recent as "a few weeks ago."  (*See id.*)

 Colors+ has pointed to various social media activity demonstrating confusion.  The first is a Facebook post dated July 1, 2022, in which the user wrote, in relevant part: "The Colors+ Youth Center which offers programming and *licensed counseling* for LGBTQ+ youth …"  (Doc. No. 27-1 at PageID #779 (emphasis added).)  At the hearing, Kameron confirmed that Colors+ never offered licensed counseling, and when asked whether this demonstrated confusion, merely responded, "I would have to ask [the user].  I don't want to assume."  (*See* 4/8/2025 Hearing Tr., 295:14-296:6.)

Colors+ submitted a second Facebook post dated November 2, 2021, in which a local community organization posted a picture of a job listing for Counseling captioned with, "Our friends at Colors+ Youth Center are hiring!!"  (Doc. No. 27-1 at PageID #780.)  When asked about this, Kameron responded, "Colors+ is part of both names, and *for the Counseling, sometimes people call*

*us Colors+ as well*"—which Colors+ has characterized as a "candid admission of the rampant confusion." (*See* 4/8/2025 Hearing Tr., 297:6-7; Doc. No. 31 at PageID #1033.)

Colors+ also provided evidence of confusion in relation to the ADAMHS Board. Specifically, Colors+ submits that the ADAMHS Board was confused because they sent Cronin a contract that was meant for Counseling. (*See* Doc. No. 27-1 at PageID #705; Doc. No. 31 at PageID #1034.) As established at the hearing, this was not merely the result of an administrative error in delivering the contract to the wrong email—rather, the signature block of the attached contract itself listed "Colors+ Counseling, *** Colleen Cronin, President." (Doc. No. 27-1 at PageID #748.) When this point was raised at the hearing to DiVincenzo, the ADAMHS Board representative, she conceded that "[i]t looks like … that there was some confusion when they were putting the contract together." (*See* 4/8/2025 Hearing Tr., 253:17-24.) Moreover, at the hearing, DiVincenzo admitted that she did not initially understand that Colors+ and Counseling were different until July of 2024—and that she had thus worked with Colors+ for two years without understanding that they were separate entities. (*See* 4/8/2025 Hearing Tr., 250:18-23.)

Scott-Miller also testified to various instances of confusion she witnessed recently. (*See* 3/28/2025 Hearing Tr., 177:1-178:18.) Scott-Miller also discussed confusion surrounding the Colors+ page on the Plexus website, which listed "mental health services/counseling" as a highlight of Colors+. (*See* Doc. No. 28-9 at PageID #938; 3/28/2025 Hearing Tr., 203:16-204:1.)

Finally, Colors+ has offered Kameron's conversations with community partners as evidence of confusion. For example, Colors+ references a message from Kameron to an individual, Melanie, in which Kameron indicates, in relevant part, that "[m]y spouse and I still have our private practice, Colors+ Counseling, LLC," to which Melanie responds, in relevant part, that "maybe we can catch

up soon so we can learn about Colors+ Counseling"—which Colors+ maintains is an indication that Melanie did not previously understand that Counseling was distinct from Colors+.  (Doc. No. 27-1 at PageID #841.)

These examples and others[38] illustrate that at least some consumers, community individuals, and professional partners have been unable to distinguish Colors+ and Counseling as separate entities. The Court agrees with Colors+ in that it is unlikely for the two entities to "continue to use the same service mark after their split without causing confusion."  (Doc. No. 31 at PageID #1035.)

Defendants' arguments to the contrary are unavailing.  First, Defendants assert that "LGBTQ+ youth and their families who used the services of the combined entities apparently understood the distinction between the clinical counseling arm of [Counseling] and the support, programming and advocacy services provided by [Colors+]," and that there is "no reason to expect that they will somehow become confused now."  (Doc. No. 15 at PageID #195.)  Not so.  Indeed, Scott-Miller testified to just the opposite—that while she was in public, she "ran into a grandmother and her child" who were confused as to the distinction between the entities and "were afraid that they would lose their counseling if they continued to attend the Youth Center."  (*See* 3/28/2025 Hearing Tr., 178:9-18.)

Next, Defendants contend that any purported confusion results not from the concurrent use of the Mark, but rather, from the "sudden split between two entities that for the last six years, operated as a single enterprise, which had been run by the same people, out of the same building, with the same phone number."[39]   (Doc. No. 30 at PageID #1006.)  Even if the split between the entities

---

[38] *See supra* Section I.C.2.

[39] Specifically, Defendants assert that the "confusion" with respect to the differing locations is not "confusion" in the Lanham Act sense but is simply a result of the split between Colors+ and Counseling.  (Doc. No. 30 at PageID #1022.)

contributed in some way to the confusion, the Court, in evaluating the evidence presented, is convinced that: (i) the concurrent use of the Mark independently created confusion;[40] and (ii) any continued concurrent use of the Mark will amplify such confusion considerably.  Further, Defendants assert that any such harm is "self-inflicted" and could have been avoided by not terminating Kameron. (Doc. No. 30 at PageID #1006.)  The Court rejects this argument.  Colors+ alleges that Kameron was terminated for "malfeasance," and the Court declines to find that terminating a paid employee for malfeasance constitutes a "self-inflicted harm" that prevents an entity from obtaining injunctive relief.

Finally, the Court reiterates that while "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion[,] … it does not follow that lack of evidence of actual confusion should be a significant factor."  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988).  In other words, a lack of actual confusion "does not preclude this Court from concluding that there is a 'likelihood of confusion', as actual confusion is merely one factor to be considered by the Court when it makes its determination."  *Id.*  Therefore, even if any of the above examples did not sufficiently classify as actual confusion, that is immaterial here.

Accordingly, the Court finds that this factor weighs in favor of Colors+.

---

Even if multiple factors contributed to confusion, the Court nevertheless is convinced that the concurrent use of the Mark—and any continued use going forward—only amplifies this confusion.

[40] Indeed, numerous examples of the confusion presented occurred before the entities separated.  That point alone undermines Defendants' assertions that the separation is the sole cause of the confusion—for even before July of 2024, the community and other partners did not understand the distinctions between the two entities.

e)        **Marketing Channels**

The factor regarding the extent to which the parties use the same marketing channels "requires an analysis of the parties' predominant customers and their marketing approaches." *Therma-Scan*, 295 F.3d at 636. "The more channels and buyers overlap, the greater the likelihood that relevant consumers will confuse the sources of the parties' products." *Kibler*, 843 F.3d at 1079. Conversely, "[w]here the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases." *Therma-Scan*, 295 F.3d at 636.

Most parties advertise online. *Kibler*, 843 F.3d at 1079 (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (finding shared use alone of a ubiquitous marketing channel like the internet does not clarify the likelihood of confusion)). Due to the ubiquity of online marketing, the Sixth Circuit has set forth the following considerations for deciding whether overlapping online marketing can support a finding of likely confusion:

> First, do the parties use the internet as a substantial marketing channel? *Therma–Scan*, 295 F.3d at 637 (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002)). Second, are the parties' marks used with web-based products? *Id. See, e.g., Brookfield Commc'n, Inc. v. W. Coast Entm't. Corp.*, 174 F.3d 1036, 1042, 1057 (9th Cir. 1999) (identifying "MovieBuff," which denoted software, and "moviebuff.com," which denoted a website, as marks used with web-based products). Third, do the parties' marketing channels overlap in any other way? *Therma–Scan*, 295 F.3d at 637. Only one case has conducted this analysis and there it was straightforward: the plaintiff did not produce web-based products or market them online. *Id.*

*Id.*

First, both Colors+ and Counseling use the internet as a substantial marketing channel. Both entities have their own websites in which their services are marketed.[41] Further, Kameron testified

---

[41] *See* https://www.colorsplus.org; https://colorscounseling.org.

that Counseling has had a Facebook and Instagram page since the Fall of 2023.  (*See* 4/8/2025 Hearing Tr., 292:20-293:13.)  Similarly, Cronin testified that Colors+ advertises "on social media."  (*See* 3/28/2025 Hearing Tr., 57:13.)  Such simultaneous use of the internet—and particularly social media—"'as a marketing tool exacerbates the likelihood of confusion,' given that 'entering a web site takes little effort.'"  *Heaven Hill Distilleries*, 575 F. Supp. 3d at 835 (citing *Audi AG*, 469 F.3d at 544).

Second, the Parties' uses of the Mark are occasionally associated with web-based products. *Kibler*, 843 F.3d at 1079.  Specifically, both Colors+ and Counseling offer certain forms of virtual programming.  (*See* 3/28/2025 Hearing Tr., 48:22-24, 52:9-11, 193:21-194:6; 4/8/2025 Hearing Tr., 313:3-7, 322:1-3.)  Thus, this consideration weighs mildly towards Colors+ as to the instant dispute. Third, the parties' marketing channels significantly overlap.  At the hearing, Cronin affirmed that there was "overlap between where Counseling advertises its for-profit services and Colors+ advertises its nonprofit services," testifying that "[t]hey advertise in pretty much every single space that we advertise."  (*See* 3/28/2025 Hearing Tr., 57:7-11.)  Further, both Cronin and Finnerty represented that Colors+ and Counseling advertise to similar, if not the same, customers—most specifically, the LGBTQIA+ community.  (*Id.* at 58:8-15; 133:3-7.)  Thus, this consideration weighs in favor of Colors+ but only mildly.  That is because while both Colors+ and Counseling use similar marketing channels to target the LGBTQIA+ community, including using internet to target LGBTQIA+ youth,[42]  the minimal nature of virtual programming as compared to the other in-person

---

[42] (*See also* 3/28/2025 Hearing Tr., 58:1-7 (testimony as to the importance of Instagram advertising due to being a "very prominent way of reaching youth").)

programming somewhat reduces the weight this factor carries.  *See Hydrojug, Inc. v. Five Below, Inc.*, 625 F. Supp.3d 684, 710 (N.D. Ohio Sept. 2, 2022) (Barker J.)

### f)       Likely Degree of Purchaser Care

When a mark is functionally identical, degree of purchaser care has little to no impact on the resolution of a case.  *AWGI*, 998 F.3d at 268.  As discussed above, Colors+ and Counseling are using the same identical Mark, or portions thereof.  *See supra* Section IV.A.2.c.  Accordingly, the Court concludes that this factor is neutral and has no impact on the resolution of the case.

### g)       Defendants' Intent in Selecting the Mark

"The intent factor concerns the defendant's 'intent to benefit' from the other mark's recognition."  *AWGI*, 998 F.3d at 268 (citing *Progressive*, 856 F.3d at 435).  According to the Sixth Circuit,

> This court may infer a likelihood of confusion from evidence that defendant chose its mark to confuse consumers about the source of the parties' products.  *Therma-Scan*, 295 F.3d at 638.  The standard assumes that defendant itself believed that using the mark would divert business from plaintiff.  *Daddy's*, 109 F.3d at 286.  Circumstantial evidence of intent is sufficient when direct evidence is unavailable (as it often is).  *Therma-Scan*, 295 F.3d at 638-39.  And evidence that defendant knew of plaintiff's trademark while using its mark constitutes such circumstantial evidence.  *Daddy's*, 109 F.3d at 286–87.  In *Champions*, the court treated testimony that defendant learned of plaintiff's trademark before using it as slight evidence that could support a finding of intent at trial.  78 F.3d at 1121.  The testimony trumped the defendant's identification of independent reasons for choosing the mark, including the "championship" caliber of a local basketball team and horses.  *Id.*  Conversely, a lack of intent has no effect on the determination of likelihood of confusion.

*Kibler*, 843 F.3d at 1081.

Here, the first use of the Mark occurred on January 11, 2021 pursuant to the Facebook Post by Colors+.[43]  (*See* Doc. No. 27-1 at PageID #692.)  It is undisputed that Kameron was involved with

---

[43] *See supra* Section IV.A.1.b.

Colors+'s social media accounts, and thus knew of this first use.  Nonetheless, the Court declines to give weight to this fact considering that Colors+ had permitted Counseling to use the Mark at that time.[44]  Accordingly, this factor is neutral as a "lack of intent has no effect on the determination of likelihood of confusion." *Kibler*, 843 F.3d at 1081.

### h)  Likelihood of Expansion

"A strong possibility that either party will expand its business to compete with the other's increases the likelihood of consumers confusing the sources of the parties' products." *Kibler*, 843 F.3d at 1082.  This factor is "neutral where neither party put forth evidence of significant expansion plans." *Maker's Mark*, 679 F.3d at 424.

The Court finds that Colors+ has not only put forth evidence demonstrating a "likelihood of expansion," but has demonstrated actual expansion by Counseling.  As discussed above, following the separation, Counseling began running a virtual teen empowerment group on Wednesdays at 4:00 p.m.  (*See* 4/8/2025 Hearing Tr., 313:8-12.)  Colors+'s "Connections+" drop-in program had already been occurring at the same time—Wednesday's at 4:00 p.m.  (*Id.* at 313:14-20.)  The Court finds this to be direct evidence of expansion, as well as an indication that future continued expansion is likely.[45]

Accordingly, the Court concludes that this factor weighs in favor of Colors+.

---

[44] To clarify, the fact that the Court is not considering Counseling's use of the Mark in January 2021 for purposes of the "intent" factor under the *Frisch* test is not a determination that such facts are irrelevant to the fraudulent trademark registration issue to be addressed later in the case.  The Court is aware of Colors+'s assertion that the "Peperas had decided between themselves to 'have[e] the counseling practice own the trademark and allow the nonprofit to use it.'" (Doc. No. 31 at PageID #1036–37.)  However, the Court finds this argument to be more relevant to the trademark registration issue, which Colors+ indicated it "w[ould] leave … for later," as opposed to the present issue of intent here.  (*Id.* at PageID #1029.)  Further, even though Colors+ did not have a complete understanding of the facts pertaining to the Mark—as discussed further below in relation to Defendants' acquiescence defense—the Court nonetheless declines to penalize Counseling for using the Mark for purposes of this factor.

[45] *See supra* note 37.

### i)    Balancing the Factors

Considering all eight factors, the evidence presented in the parties' submissions and at the hearing shows a strong likelihood of confusion.  Ultimately, factors 1, 2, 3, 4, and 8 weigh heavily in Colors+'s favor.  Factor 5 weighs mildly in Colors+'s favor.  Factors 6 and 7 are neutral and do not weigh in either side's favor.  The Court further notes that while it finds that Colors+ has demonstrated ample evidence of ongoing actual consumer confusion, it would reach the same result on balance even if Colors+'s examples were found not to constitute actual confusion caused by concurrent use of the Mark, based on the other factors presented.  Accordingly, the Court finds that Counseling's use of the Mark is likely to cause confusion and, therefore, that Colors+ is likely to succeed on the merits of its claim.

### 3.    Defendants' Affirmative Defenses

Notwithstanding the above, Defendants raise the affirmative defenses of laches and acquiescence with respect to Colors+'s Motion.  The Court will discuss each defense in-turn, below.

### a)    Laches

In their Opposition, Defendants first contend that Colors+'s Lanham Act claims are barred by the doctrine of laches.  (Doc. No. 15 at PageID #191.)  Specifically, Defendants assert that laches operates as a "de facto statute of limitations in Lanham Act claims" with a limitation period of two years.  (*Id.* at PageID #192.)  Accordingly, Defendants submit that even if the limitations period did not begin to run until actual registration, Colors+ had until February of 2024 to file its Complaint— and because it did not file until January of 2025, its claim is barred.  (*Id.* at PageID #193.)

In its Reply, Colors+ contends that "[a]lthough laches precludes a plaintiff from recovering damages, it does not bar injunctive relief."  (Doc. No. 17 at PageID #232.)  Accordingly, Colors+

maintains that even if laches applied, it would not preclude injunctive relief in favor of Colors+. (*Id.*) Neither party addresses laches any further in their Supplemental Briefs.[46]

Under Sixth Circuit precedent, "laches bars damages that occurred before the filing date of the lawsuit but does not prevent a plaintiff from obtaining injunctive relief or post-filing damages."[47] *DayCab Co., Inc. v. Prairie Technology, LLC*, 67 F.4th 837, 856 (6th Cir. 2023) (citing *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002)); *see also Campfield v. Safelite Group, Inc.*, 91 F.4th 401, 409 (6th Cir. 2024) ("However, laches bars only recovery of pre-filing damages; it does not prevent [the plaintiff] from obtaining injunctive relief or post-filing damages."); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000) ("Although laches precludes a plaintiff from recovering damages, it does not bar injunctive relief."). Accordingly, the Court concludes that Defendants' laches defense is inapplicable to the present request for injunctive relief.[48]

### b) Acquiescence

The Court next turns to Defendants' acquiescence affirmative defense.

In their Opposition, Defendants contend that Colors+ acquiesced in Counseling's use of the Mark. (Doc. No. 15 at PageID #193.) Specifically, Defendants assert that Colors+ was "well aware

---

[46] It is unclear whether Defendants intended to abandon the issue of laches by not referencing it in their Supplemental Brief. In any event, for the reasons explained below, the Court concludes that the doctrine is inapplicable to the present Motion.

[47] The Court is aware of one Sixth Circuit case questioning whether the general rule rendering laches inapplicable to equitable relief is still good law in light of two Supreme Court's decisions. *See McKeon Products, Inc. v. Howard S. Leight and Associates, Inc.*, 15 F.4th 736, 741 n.2 (6th Cir. 2021) (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 675–77 (2014); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393–94 (2006)). However, since *McKeon Products, Inc.*, the Sixth Circuit has issued two published opinions reiterating its longstanding rule that the doctrine of laches does not prevent a plaintiff from obtaining injunctive relief. *See DayCab Co., Inc.*, 67 F.4th at 856; *Campfield*, 91 F.4th at 409. Accordingly, the Court follows the Sixth Circuit's most recent precedent on the issue and concludes that the doctrine of laches is inapplicable to Colors+'s request for injunctive relief.

[48] In addition, the Court independently rejects Defendants' laches defense for the same "unclean hands" reasons discussed below with respect to their acquiescence defense. *See infra* Section IV.A.3.b.

that Counseling was using the mark" since early 2021, and that the continued use by both entities constitutes "at least an implicit assurance that [Colors+] would claim [sic][49] first use hostile to Counseling's registration and use." (*Id.* at PageID #193–94.) Thus, Defendants maintain that Colors+ induced reliance on Counseling's part because Counseling "could have addressed the issue before it continued to rely on the mark (or portion thereof) to build goodwill in the community" had Colors+ raised the issue earlier. (*Id.* at PageID #194.)

In their Supplemental Brief, Defendants point to various evidence presented at the hearing to support their defense of acquiescence. First, Defendants direct this Court's attention to the testimony of Kameron and Lennon that Counseling began using the name "Colors+ Counseling" in 2017 through its Psychology Today listing prior to Colors+'s creation.[50] (Doc. No. 30 at PageID #1020.) Second, Defendants contend that Colors+ "plainly acquiesced to Counseling's use of the name" because the "facts are undisputed that the Youth Center, through both the Peperas and the Board, knew that Counseling was using both the Colors+ name and the mark continuously from early 2021 through July of 2024." (*Id.*) Defendants reference specific examples including the name appearing in brochures promoting both organizations, as well as Colors+'s social media activity including "Colors+ Counseling" or Counseling's use of the Mark. (*Id.*) Finally, Defendants point to the testimony of the Board members to demonstrate that at the time, they did not object to Counseling's use of the name or Mark.[51] (*Id.*)

---

[49] It appears that Defendants made a typographical error in asserting that Colors+ implicitly assured Counseling that it "would claim first use hostile to Counseling's registration and use" rather than "would *not* claim first use hostile to Counseling's registration and use." (Doc. No. 15 at PageID #194.) The Court construes Defendants' argument as contending that the continued use of the Mark by both entities constituted an implicit assurance that Colors+ would *not* claim first use hostile to Counseling's registration and use.

[50] As explained above, the Court declines to give weight to this testimony. *See supra* note 4.

[51] Specifically, Counseling references the following testimony of Cronin:

In its Reply, Colors+ maintains that "Colors+ did not acquiesce in Counseling's usurpation of its service mark." (Doc. No. 17 at PageID #232–33.) Colors+ points to the lack of various evidence demonstrating acquiescence, including: (i) "Board meeting minutes evidencing Kameron's alleged discussion with the Board about Counseling's intent to register the mark"; (ii) "minutes showing that the Board determined it was in Colors+'s best interests to concede ownership of the mark to Counseling"; and (iii) "minutes showing that Colors+ accepted a license to use the mark under Counseling's control." (*Id.*) Colors+ also raises issues as to the lack of details regarding the alleged license including: (i) its term; (ii) whether it was renewable; (iii) whether it was exclusive; (iv) what control over the mark Counseling allegedly retained; or (v) what the royalty payments were. (*Id.* at PageID #233.) Colors+ contends that none of these questions can be answered because no evidence exists to support acquiescence. (*Id.*)

---

Q:  Well, then to my question, if the Youth Center is reposting something from Colors+ Counseling, using Colors+ Counseling's name, using that image, using that mark, doesn't that indicate that the Youth Center – assuming for the point of argument that the Youth Center owns the mark, as you contend, doesn't that indicate that the Youth Center's okay with them using the mark?
A:  I suppose it does.  I wasn't in charge of the daily operations.  Kameron was in charge of the Youth Center, and Lennon was in charge of the Counseling at that point.

(*See* 3/28/2025 Hearing Tr., 84:5-14.)  Counseling also references the following testimony of Finnerty:

Q:  Did you have a problem with the fact that Colors+ Counseling had a sign on the door that had the trademark and the logo?
A:  They're sharing the same space with the Colors+ Youth Center, so I did not have a problem with it at the time.
Q:  Did you ever tell Kameron and Lennon … that you only were consenting to their use of the logo and the trademark as long as they were sharing space with the Youth Center?
A:  No.

(*Id.* at 154:12-21.)  Finally, Counseling references Scott-Miller serving as a Board member while being a paid contractor with Counseling, as well as various annual reports presented by Kameron to the Board that included Counseling using the logo, to which no objection was made.  (Doc. No. 30 at PageID #1020–21.)

In its Supplemental Brief, Colors+ reiterates that the evidence presented at the hearing indicates that "Colors+ never represented that it would allow Counseling to use the Mark after Counseling moved out of Colors+ Youth Center and severed all ties." (Doc. No. 31 at PageID #1041.) Rather, Colors+ maintains that it merely "tolerated Counseling's use of the Mark in joint advertising with Colors+" at the time because Counseling was "sharing space with the Colors+ Youth Center." (*Id.*) Next, Colors+ asserts that it did not inexcusably delay asserting its trademark rights because it only discovered in September 2024 "that Counseling was still using the Mark after the parties split," and brought suit within six months of that discovery and "only after several months of failed negotiations." (*Id.*)  Similarly, Colors+ contends that Counseling has not been unduly prejudiced because "Counseling was on notice of Colors+'s trademark claim within a couple months of the parties' split," yet "chose to expand its footprint and services using the Mark." (*Id.* at PageID #1042.) Further, Colors+ asserts that an acquiescence defense "can only be brought by a party with clean hands," of which "Counseling is sorely lacking." (*Id.*)  Finally, Colors+ submits that even if the Court were to find that Colors+ acquiesced in Counseling's use of the Mark, it is immaterial because "acquiescence can be overcome if the Court finds that inevitable confusion arises from the continued dual use of the marks." (*Id.*)

Acquiescence is an affirmative equitable defense to trademark infringement that requires "a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Bar's Products Inc. v. Bars Products International Inc.*, 662 Fed. App'x. 400, 412–13 (6th Cir. 2016); *Kellogg Co.*, 209 F.3d at 569.  "Acquiescence requires unreasonable delay in enforcing trademark rights, prejudice to the defendant, and a showing, by words or conduct, that the trademark holder 'actively consented'

to use of the mark." *Bar's Products Inc.*, 662 Fed. App'x at 413 (citing *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 451 (4th Cir. 2004)) (alterations omitted). "Although both laches and acquiescence require proof that the party seeking to enforce its trademark rights has unreasonably delayed pursuing litigation and, as a result, materially prejudiced the alleged infringer, acquiescence requires more." *Kellogg Co.*, 209 F.3d at 569; *see also id.* (citing *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)) ("[A]cquiescence implies active consent, while laches implies a merely passive consent.").

"The doctrine bars a plaintiff's claim, however, only when the plaintiff has 'full knowledge, or at least … sufficient notice or means of knowledge, of his rights, and of all the material facts.'" *Osborn v. Griffin*, 2016 WL 1092672, at *32 (E.D. Ky. Mar. 21, 2016) (citing *Hazard Coal Corp. v. Ky. West Va. Gas Co., L.L.C.*, 311 F.3d 733, 740 (6th Cir. 2002)); *see also Lewis v. Ceralvo Holdings, LLC*, 2016 WL 6436569, at *2 (W.D. Ky. Oct. 27, 2016) (similar); *Hazard Coal Corp.*, 311 F.3d at 741 ("[E]quity will debar a party from recovery when he stands by and knowingly permits another to deal with his property as though it were rightfully his or he was rightfully dealing with it and makes no objection.").

Moreover, [i]t is well-settled law that a party must have clean hands to invoke an equitable defense." *Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC*, 2009 WL 3199882, at *13 (E.D. Mich. Sept. 20, 2009) (citing cases); *see also Greenwood v. Raznick*, 326 Fed. App'x 362, 369 (6th Cir. 2009) ("Although unclean hands is a defense usually asserted by defendants against plaintiffs, … unclean hands can be asserted in opposition to an equitable defense as well as being assertible as a defense to a claim for equitable relief."); *Osborn*, 2016 WL 1092672, at *30 (similar); *American Air Filter Co., Inc. v. Universal Air Products, L.L.C.*, 2015 WL 1541937 (W.D. Ky. Apr. 7, 2015)

66

(holding that unclean hands may bar assertion of laches defense in Lanham Act case); *Barrio Bros., LLC v. Revolucion, LLC*, 2021 WL 2895509, at *13 (N.D. Ohio July 9, 2021) (Barker J.).

"A person who knowingly and purposefully violates a legal duty has unclean hands." *Osborn*, 2016 WL 1092672, at *30; *American Air Filter Co., Inc.*, 2015 WL 1541937, at *4. However, to have unclean hands, "one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character." *Days Inn Worldwide, Inc.*, 2009 WL 3199882, at *12. Rather, "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the Court." *Id.* (internal quotation marks omitted).

Finally, the "defense of acquiescence is not absolute." *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1334 (11th Cir. 1996); *see also District Brewing Co., Inc. v. CBC Restaurant, LLC*, 2016 WL 1366230, at *5 (S.D. Ohio Apr. 6, 2016) (holding that a finding that a plaintiff has acquiesced to a defendant's use of its trademarks "does not, however, end the inquiry"). Rather, "acquiescence can be overcome if the [c]ourt finds that inevitable confusion arises from the continued dual use of the marks." *District Brewing Co., Inc.*, 2016 WL 1366230, at *5 (citing *SunAmerica Corp.*, 77 F.3d at 1334)) (internal quotation marks omitted); *see also Johnny's Fine Foods, Inc. v. Johnny's Inc.*, 286 F. Supp.2d 876, 885 (M.D. Tenn. Oct. 2. 2003). "[T]he standard of confusion required for a finding of inevitability of confusion is an increment higher than that required for a finding of a likelihood of confusion," and a "finding of actual confusion is strong proof of a likelihood of confusion." *SunAmerica Corp.*, 77 F.3d at 1334 n.3; *District Brewing Co., Inc.*, 2016 WL 1366230, at *5.

Having set forth the above principles, the Court hereby rejects Defendants' acquiescence defense for three reasons.

First, the Court finds that Colors+ did not have "full knowledge, or at least … sufficient notice or means of knowledge, of his rights, and of all the material facts."  *Osborn*, 2016 WL 1092672, at *32.  As previously explained above, the Court is not convinced that the Board was informed in January 2021 that Counseling would be registering the Mark, or that the Board consented to such an action.  *See supra* Section IV.A.1.a.  Rather, the Board believed that the Mark was registered in Colors+'s name—as demonstrated by Cronin testifying that Kameron had "conveyed … to us that the trademark was registered and that we owned it," which was also corroborated by Scott-Miller.[52] (*See* 3/28/2025 Hearing Tr., 44:6-8, 170:6-11.)  Thus, although Defendants reference the Board's purported lack of objections to Counseling's use of the Mark in its marketing, any such lack of objections must be viewed within the context that Colors+ believed it had already registered the Mark in its own name.  *See id.*  Any purported acquiescence by the Colors+ Board of Counseling utilizing the Mark therefore occurred without the "full knowledge" or "sufficient notice" that such use could risk losing ownership of the Mark due to Counseling's trademark registration filing.  *Osborn*, 2016 WL 1092672, at *32.  Accordingly, without such knowledge, the Board could not have truly "actively consented" in the manner required for an acquiescence defense.  *Id.*

Second, even if Colors+ was found to have had full knowledge, Defendants' acquiescence defense is barred by the doctrine of unclean hands.  *See Days Inn Worldwide, Inc.*, 2009 WL 3199882, at *13.  As explained above, "[a]ny willful act concerning the cause of action which rightfully can be

---

[52] Cronin further testified that upon discovering Counseling's trademark application, she brought it to the Board who was "shocked," "angry," and "surprised."  (*See* 3/28/2025 Hearing Tr., 54:15-21.)

said to transgress equitable standards of conduct is sufficient cause" for the Court to find unclean hands. *Id.* at *12. To begin, the Peperas intentionally misled the Board as to the registration of the Mark—despite having an understanding that they owed fiduciary duties to Colors+.[53] (*See* 3/28/2025 Hearing Tr., 44:6-8, 170:6-11; 4/8/2025 Hearing Tr., 278:2-8.) Further, Lennon filed a Wix Complaint (and other social media complaints including Instagram) for "trademark infringement" despite having allegedly given Colors+ "blanket authorization" to use the Mark.[54] (*See* 4/8/2025 Hearing Tr., 309:23-310:6.) The Wix and Instagram Complaints simultaneously allowed Defendants to use the Mark online while prohibiting Colors+ from doing so—thereby contributing to the community confusion claimed by Colors+. The Court finds that these actions both concern Colors+'s cause of action (as to the issues of acquiescence and confusion respectively) and "transgress equitable standards of conduct" sufficient to apply the doctrine of unclean hands. *Days Inn Worldwide, Inc.*, 2009 WL 3199882, at *12. Defendants thus cannot raise the defense of acquiescence as it relates to Colors+'s request for injunctive relief. *Id.* at *13.

Finally, even if this Court permitted Defendants to raise their acquiescence defense and found that Colors+ did acquiesce to the use, such a finding would be immaterial because the Court concludes that inevitable confusion would occur from concurrent use of the Mark. As explained previously, the

---

[53] *See supra* note 29.

[54] The Court pauses to note the duality of Defendants' position here. Defendants maintain that Counseling has owned the Mark since January 2021 and provided Colors+ "blanket permission" to use it until September 2024—at which point Defendants allegedly withdrew all permissions of Colors+'s use by filing a Wix Complaint for "trademark infringement." Yet Defendants vigorously challenge Colors+'s narrative in which Colors+ purports to have essentially done the same thing. Specifically, Colors+ maintains that *it* has owned the Mark since January 2021 and tolerated Counseling's use of it until the Parties' fallout—and now asserts that Counseling should stop using the Mark because it no longer has permission from Colors+ to do so. Defendants appear to ask this Court to conclude that if Colors+ owns the Mark, its "acquiescence" should permit Counseling to continue using the Mark—yet if Counseling owns the Mark, the same acquiescence rules should not apply, and this Court should excuse the filing of the Wix Complaint as a permissible action taken by the Defendants.

eight *Frisch* factors overwhelmingly indicate a likelihood of confusion. *See supra* Section IV.A.2.i. And the standard of confusion for "inevitability of confusion" is only an "increment higher than that required for a finding of a likelihood of confusion." *SunAmerica Corp.*, 77 F.3d at 1334 n.3. For the same reasons given in the previous analysis of the *Frisch* factors, the Court concludes that the concurrent use of the Mark would create inevitable confusion. And because "acquiescence can be overcome if the Court finds that inevitable confusion arises from the continued dual use of the marks," Defendants' acquiescence defense is futile.[55] *District Brewing Co., Inc.*, 2016 WL 1366230, at *5.

For all the reasons set forth above, the Court concludes that Defendants' affirmative defenses of laches and acquiescence fail. Accordingly, the Court finds that Colors+ has established a likelihood of success on the merits of its service mark infringement claim.

## B. Irreparable Harm

Having determined that Colors+ has established a likelihood of success on the merits of its service mark infringement claim, the Court now turns to the second factor in the preliminary injunction analysis—whether Colors+ will suffer irreparable harm without an injunction.

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550. A plaintiff's injury is considered "irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

---

[55] Because the Court concludes that Colors+'s alleged "acquiescence" would be immaterial even if proven by Defendants, the Court need not reach the ultimate issue for purposes of this Opinion as to whether Colors+'s actions satisfy the test for acquiescence. Accordingly, the Court makes no final determinations on that issue.

As of December 2020, the Lanham Act provides for a "rebuttable presumption of irreparable harm upon … a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction …."  15 U.S.C. § 1116(a).  In a trademark case, "irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values …."  *Wynn Oil Co. v. Am. Way Service Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (internal quotation omitted).

Because the Court has concluded that Colors+ is likely to succeed on the merits of its service mark infringement claim, § 1116(a)'s presumption of irreparable injury applies.  Nevertheless, Defendants attempt to rebut the presumption in three ways.  First, Defendants argue that Colors+ cannot establish irreparable harm from Counseling's use of the Mark because the two entities always shared use of the Mark, the "services provided by each have always been distinct," and the concurrent Mark has "been the status quo for at least the last four years" without issue.  (Doc. No. 15 at PageID #181, 195.)  Second, Defendants contend that Colors+ has offered no evidence of customer confusion. (*Id.*)  Finally, Defendants assert that any harm to Colors+ is a "self-inflicted" injury caused by terminating Kameron.  (Doc. No. 30 at PageID #1006; *see also* Doc. No. 15 at PageID #181.)  None of these attempts to rebut the presumption are persuasive.

First, the Court rejects Defendants' assertions regarding the recent concurrent use of the Mark. Since Colors+ and Counseling split, Counseling has begun expanding its services to directly compete with Colors+.  *See supra* Section IV.A.2.h.  The Court thus finds that the "status quo" has been altered in that both entities are now utilizing the Mark in competition with one another—thereby harming Colors+.

Second, the Court disagrees that Colors+ has offered no evidence of customer confusion.  As explained above, Colors+ has offered numerous examples of confusion from the public, to which the concurrent use of the Marks contributes.  *See supra* Section IV.A.2.d.  Moreover, in addition to actual confusion, the *Frisch* factors indicate that there is a strong likelihood of confusion moving forward. *See supra* Section IV.A.2.i.  Accordingly, Defendants' argument on this point is unavailing.

Finally, the Court rejects the notion that this is a "self-inflicted" injury.  As previously explained, Colors+ alleges that Kameron was terminated for "malfeasance."  The Court declines to find that terminating a paid employee for malfeasance constitutes a "self-inflicted harm."  To hold otherwise would be to force an employer whose employee has committed malfeasance to choose between: (i) terminating the employee at the risk of being unable to protect itself through injunctive relief should any harm ensue thereafter; or (ii) retaining the employee and risking further malfeasance on behalf of the organization.  The Court is not persuaded that this dilemma is optimal and declines to punish Colors+ in accordance therewith.

Accordingly, the Court concludes that Defendants have not rebutted Colors+'s presumption of irreparable harm.

## C.      Substantial Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others."  *Flight Options, LLC v. Int'l Brotherhood of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017).  "This factor is generally concerned with harm to third parties, not those parties involved in the dispute."  *Trilogy Healthcare of Louisville East, LLC v. Camelot Leasing, LLC*, 2019 WL 3991073, at *11 (W.D. Ky. Mar. 22, 2019) (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550–51 (6th Cir. 2007)).

72

Colors+ asserts that third parties will benefit from an injunction—not be harmed—because it will reduce confusion between the two entities.  (Doc. No. 31 at PageID #1038.)  Specifically, Colors+ contends that an injunction will clarify that Colors+ is still operating and providing a range of free services to an at-risk and underserved population; reduce confusion about the source and sponsorship of Defendants' counseling and related services; and reduce confusion among donors and grantors …"  (*Id.*)  Defendants do not address this factor aside from asserting that the injunction "will have little effect on any other parties or the public interest."  (Doc. No. 15 at PageID #196.)

The Court finds that this factor weighs in favor of granting the injunction with respect to Colors+'s service mark infringement claim.  As correctly noted by Colors+, reducing confusion between the two entities will benefit third parties—not harm them.  Indeed, this is supported by Scott-Miller's testimony, who indicated that she "ran into a grandmother and her child" who were confused as to the distinction between the entities and "were afraid that they would lose their counseling if they continued to attend the Youth Center."  (*See* 3/28/2025 Hearing Tr., 178:9-18.)  Further, Defendants do not substantively address this factor.  Thus, the Court concludes this factor weighs in favor of granting the preliminary injunction.

## D.  Public Interest

The fourth and final factor courts must consider when granting a preliminary injunction is "whether the public interest will be served by an injunction." *Flight Options*, 863 F.3d at 540.  "In cases of trademark infringement, the public interest disfavors the use of service marks that are likely to be deceptive or cause confusion." *Express Mortg. Brokers, Inc. v. Simpson Mortg., Inc.*, 1994 WL 465842, at *5 (E.D. Mich. May 6, 1994).  Accordingly, "[i]f the movant is likely to succeed on an infringement claim, … the public interest will usually favor injunctive relief." *PGP, LLC v. TPII,*

*LLC*, 734 Fed. App'x 330, 332 (6th Cir. 2018); *see also Audi AG*, 469 F.3d at 550 ("It was in the public's interest to issue the injunction in order to prevent customers from being misled.").

The Court finds that this factor weighs in favor of granting the preliminary injunction. As already explained, Colors+ has demonstrated a likelihood of confusion by the concurrent use of the Mark, and the "public interest disfavors the use of service marks that are likely to … cause confusion." *Express Mortg. Brokers, Inc.*, 1994 WL 465842, at *5. Further, Defendants do not substantively address this point other than to assert that the "injunction will have little effect on any other parties or the public interest."[56] (Doc. No. 15 at PageID #196.)

Accordingly, the Court concludes that the public interest benefits if an injunction is granted.

### E.    Balancing the Preliminary Injunction Factors

In sum, Colors+ has demonstrated a likelihood of success on the merits as to its service mark infringement claim,[57] irreparable harm, a lack of substantial harm to others, and that the public interest would be served if an injunction is granted. Accordingly, in light of Colors+ meeting all four factors, the Court concludes that Colors+ is entitled to a preliminary injunction.[58]

---

[56] Defendants also assert that "there is no evidence that the split between the two entities has had any impact on the public's ability to obtain services from either" and that "neither entity is actually using the Mark as registered." (Doc. No. 15 at PageID #196.) This assertion is rebutted by various evidence in the record including Scott-Miller's testimony. (*See* 3/28/2025 Hearing Tr., 178:9-18.) Further, Kameron conceded at the preliminary injunction hearing that Counseling was using the exact Mark in some places. (*See* 4/8/2025 Hearing Tr., 318:9-19.)

[57] The Court finds the same with respect to Colors+'s claim for false designation. *See JTH Tax, Inc.*, 2019 WL 2057323, at *4 ("The test for false designation or misrepresentation under Section 43(a) of the Lanham Act … is essentially the same as that for service mark infringement.").

[58] The Court finds it unnecessary to address the likelihood of success on the merits of Colors+'s fraudulent registration for two reasons. First, the Court concludes that Colors+ has demonstrated a likelihood of success on the merits of its service mark infringement claim, which is independently sufficient to obtain the injunctive relief sought by Colors+. Second, in its Supplemental Brief, Colors+ notes that it is "not required to prove that Counseling fraudulently registered the Mark to prove that Colors+ is the rightful owner," and that accordingly, "although Colors+ believes it proved fraudulent registration, Plaintiff will leave that argument for later." (Doc. No. 31 at PageID #1029.)

74

F.      **Scope of Preliminary Injunction**

Having concluded that Colors+ is entitled to a preliminary injunction, the Court next turns to the appropriate scope of that injunction.

The Lanham Act grants federal courts hearing trademark or service mark infringement actions "power to grant injunctions according to the principles of equity and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116(a).  "Courts must closely tailor injunctions to the harm that they address."  *CFE Racing Products, Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 595 (6th Cir. 2015) (internal quotation marks omitted).  Indeed, "the remedial purpose of the injunction must be 'to restore to the plaintiff the rightful control over its mark and eliminate the likelihood of confusion of the defendants' products with those of the plaintiff.'"  *Id.* at 596.  "In a trademark case, a court determines the scope of an injunction depending upon: the manner in which the plaintiff is harmed; the ways in which the harm can be avoided; the viability of the defendant's defenses; the burden that would be placed on the defendant; and the potential effect upon lawful competition between the parties."  *Id.* at 595 (quoting *ProNational Ins. Co. v. Bagetta*, 347 F. Supp.2d 469, 472 (E.D. Mich. 2004)) (citing *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130 (1947)).

In the Motion, Colors+ requests an injunction ordering the following relief:[59] (i) "Prohibiting Defendants from using the registered Colors+ service mark; (ii) "Prohibiting Defendants from using 'Colors+' or 'Colorsplus' in its company name ('Colors+ Counseling') or to otherwise identify itself or its services"; (iii) "Prohibiting Defendants from representing to any person or entity that Defendants (or any of them) owns the 'Colors+' or 'Colorsplus' name or registered service mark"; (iv) "Prohibiting Defendants from pursuing registration with the U.S. Patent and Trademark Office

---

[59] The Court notes that the requested relief in Colors+'s Motion appears in a slightly different order than the Court has set forth above.  However, for purposes of clarity, the Court finds it appropriate to address the issues in this order.

of the name 'Colors+ Counseling' or any derivation of the name 'Colors+' or 'Colorsplus'"; (v) "Prohibiting Defendants from representing to any person or entity that Colors+ is defunct or otherwise not providing services to the LGBTQ+ community"; (vi) "Prohibiting Defendants from misrepresenting themselves as providing services other than for profit"; (vii) "Prohibiting Defendants from accepting any donations, grants or perquisites intended for any non-profit organization, including without limitation, Colors+"; and (viii) "Requiring Defendants to assist reasonably in the reinstatement of Colors+ websites and social media sites."  (Doc. No. 5 at PageID #72–73.)  The Court will address each requested form of relief below.

### 1.    Prohibiting Defendants' Use of the Registered Mark

Colors+ first requests an injunction "[p]rohibiting Defendants from using the registered Colors+ service mark."  (Doc. No. 5 at PageID #72.)  Colors+ also requests an injunction "[p]rohibiting Defendants from representing to any person or entity that Defendants (or any of them) owns the 'Colors+' … registered service mark."[60]  (*Id.*)

As determined above, the Court concludes that Colors+ is the owner of the specific Mark at issue (i.e., the rainbow "Colors+" mark that incorporates the progress flag), and that Colors+ and Counseling's concurrent use of the Mark creates a likelihood of confusion.  Therefore, the Court finds that an order prohibiting Defendants from using that registered Mark is "closely tailored" to the harm and would appropriately "restore to the plaintiff the rightful control over its mark and eliminate the likelihood of confusion."  *CFE Racing Products, Inc.* 793 F.3d at 595.

---

[60] The Court notes that in this same request, Colors+ also requests that the Court prohibit Defendants from representing that they own the name "Colors+" or "Colorsplus" in addition to the registered service mark.  (Doc. No. 5 at PageID #72.) The Court will address the issues surrounding use of the "name" separately below.

For the same reasons, the Court finds it appropriate to invalidate Counseling's registration of the Mark. The Lanham Act "authorizes district courts to rule directly on the validity of a registration." *Id.* at 593 (citing 15 U.S.C. § 1119). "Appellate courts have found an abuse of the discretionary authority granted by § 1119 where district courts 'refus[e] to order the cancellation of registrations for claimed marks found to be incapable of serving as valid marks.'" *Id.* Here, the Court has determined that Colors+ is the rightful owner of the specific Mark at issue. Accordingly, pursuant to § 1119, the Court hereby invalidates Counseling's registration of the Mark—specifically, the trademark with U.S. Serial No. 90600142 and U.S. Registration No. 6652187 that Counseling filed for ownership of on March 24, 2021, and to which registration was issued on February 22, 2022. (*See also* Doc. No. 27-1 at PageID #677–86 (Counseling's trademark application).)

Finally, the Court finds it appropriate to enjoin Defendants from using any similar but slightly altered version of the specific Mark at issue. When fashioning an injunction, "the court must give careful consideration to the possibility that a defendant found to have either infringed the plaintiff's mark or unfairly competed with the plaintiff will modify his behavior ever so slightly and attempt to skirt the line of permissible conduct." *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 154 (5th Cir. 1985). Thus, "[c]ourts have responded to this problem by issuing broad injunctions that prohibit conduct that clearly infringes the plaintiff's mark as well as conduct that ordinarily would not justify any relief." *Id.* (permitting defendants to use a certain name but specifying that such use "must be in a form which does not resemble in any way the manner in which [the plaintiff] prints the name").

In this case, the Court is mindful of the possibility that Defendants could slightly modify the Mark to circumvent Colors+'s ownership rights of the Mark—for example, by making a minor edit

to the Mark. The Court is particularly cautious in light of the evidence presented relating to Defendants' "unclean hands" as discussed in relation to their acquiescence defense. *See supra* Section IV.A.3.b. Therefore, the Court finds it both justified and closely tailored to enjoin Defendants from using any variation of the Mark that resembles it in any way or manner.[61]

### 2. Prohibiting Defendants' from Using the Name Colors+

Next, Colors+ requests various injunctive relief pertaining to use of the name "Colors+" or "Colorsplus" in addition to the specific Mark itself. Specifically, Colors+ requests an injunction: (i) "[p]rohibiting Defendants from using 'Colors+' or 'Colorsplus in its company name ('Colors+ Counseling') or to otherwise identify itself or its services; (ii) "[p]rohibiting Defendants from representing to any person or entity that Defendants (or any of them) owns the 'Colors+' or 'Colorsplus' name …"; and (iii) "[p]rohibiting Defendants from pursuing registration with the U.S. Patent and Trademark Office of the name 'Colors+ Counseling' or any derivation of the name 'Colors+' or 'Colorsplus'." (Doc. No. 5 at PageID #72.)

As previously explained, the remedial purpose of an injunction must be "to restore to the plaintiff the rightful control over its mark," and as such, "[c]ourts must closely tailor injunctions to the harm that they address." *CFE Racing Products, Inc.*, 793 F.3d at 595–96. In this regard, courts have found that a plaintiff's protectable rights as to a particularly designed trademark or service mark does not necessarily entitle that plaintiff to automatically obtain an injunction enjoining the use of the broader name associated with the specific mark. *See, e.g.*, *Conan Properties, Inc.*, 752 F.2d at 155

---

[61] To clarify, this Order does not extend to the mere use of the "name" Colors+, which is addressed separately below. Rather, the Court here is referring to the *design* of the current Mark—namely, the font, rainbow coloring, progress flag, etc.—and any variations or alterations that could be made thereto that would still resemble the Mark.

("Although we conclude that [the plaintiff] has protectable rights in the CONAN THE BARBARIAN name and character, we hold that CPI lacks similar rights in merely the name Conan.").

"Rights in a trademark are determined by the date of the mark's first use in commerce." *Plastics NYC, LLC*, 2024 WL 3933750, at *6.   "A mark shall be deemed to be use[d] in commerce … on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce …"  *Bodine*, 667 F. Supp.3d at 628; *see also* 15 U.S.C. § 1127.

While the Court concludes that Colors+ owns the specific Mark at issue, it cannot similarly conclude the same at this juncture with respect to the general name, "Colors+" or "Colorsplus."  With respect to the specific Mark, it is clear to the Court that Colors+ was the first to "use [it] in commerce" such as to create an ownership interest in that Mark.  *See supra* Section IV.A.1.b.

The same cannot be said of the general name, "Colors+."  As a preliminary matter, the Court finds Colors+'s ownership of the Mark at issue to be limited to that specifically designed Mark—and to not encompass the name "Colors+" as a whole.  Indeed, even when Defendants sought to register the Mark on behalf of Counseling, they described the "Color(s) Claimed" and "Description of the Mark" as follows:

> "The color(s) red, orange, yellow, green, blue, purple, white, pink, light blue, brown and black *is/are claimed as a feature of the mark.*  * * *  The mark consists of the word "COLORS" with a "+" sign next to it, all in a stylized rainbow font with the colors, from top to bottom, red, orange, yellow, green, blue, and purple.  Inside the plus sign on the right side is a small white triangle with arrows point to the right next to it in pink, light blue, brown, and black. "COLORS+" is outline in black."

(Doc. No. 27-1 at PageID #677.)  This is distinguishable from *CFE Racing Products, Inc.*, in which the trademark "had no specification as to style, font, size, or color."  793 F.3d at 596.  Thus, the ownership of the name "Colors+," and the first use of that name in commerce, must be separately evaluated.  *See* § 1127.

The evidence presented at the preliminary injunction hearing underscores the ambiguity surrounding the ownership of the name "Colors+." It is undisputed that Colors+ was formally incorporated in January 2018, while Counseling was formally incorporated in August 2018. (*See* 4/28/2025 Hearing Tr., 232:12-22; 238:7-15.) However, while those dates pertain to the articles of incorporation being filed, the "use in commerce" inquiry hinges on the date that the mark was first used in the "advertising of services and the *services are rendered in commerce*." *See* § 1127 (emphasis added). The proper inquiry, then, is who used the name "Colors+" or "Colorsplus" first in relation to advertising services that are rendered in commerce.

The minimal evidence presented on this point does not permit the Court to conclude that Colors+ was the first user. At the hearing, Kameron testified that through the counseling practice, she was "practicing online, working with people … at least by September of 2018, and then started seeing people in December in person." (*See* 4/8/2025 Hearing Tr., 235:1-4.) Further, Kameron testified that the counseling practice began using the name "Colors+ Counseling" by at least 2018. (*Id.* at 235:5-7.) And Finnerty, when questioned, did not have sufficient knowledge to refute these points.[62] (*See* Hearing Tr., 144:4-11.) Thus, it appears that by the time Kameron, through Counseling, began rendering counseling services in late 2018, the name "Colors+ Counseling" was

---

[62] Specifically, Finnerty's testimony was as follows:

> Q: So you wouldn't know that Colors+ Counseling had actually started video services in August and September of 2018, correct?
> A: I wouldn't know.
> Q: And you didn't know when you started on the board that Colors+ Counseling had been using the name "Colors+" for many months prior to you sitting on the board, correct?
> A: Correct.

(*See* 3/28/2025 Hearing Tr., 144:4-11.)

being used in relation thereto. As for Colors+, Kameron testified that Colors+ "didn't start having services until, I believe it was January 23rd of 2019." (*Id.* at 238:7-11.)

Although not the focal point of the hearing, the minimal testimony presented prevents the Court from concluding that Colors+ was the first to "use in commerce" the name "Colors+" such as to create an enforceable ownership interest in that name. *See* § 1127. Rather, given that the evidence thus far appears to indicate that Counseling "use[d] in commerce" the name before Colors+ did—or, at the very least, fails to affirmatively establish Colors+ as the first user—the Court concludes that it would be inappropriate to enjoin Counseling from using the name "Colors+" or "Colorsplus."

The Court therefore declines to issue an injunction at this time[63] prohibiting Defendants from: (i) "using 'Color+' or 'Colorsplus' in its company name ('Colors+ Counseling') or to otherwise identify itself or its services"; (ii) "representing to any person or entity that Defendants (or any of them) owns the 'Colors+' or 'Colorsplus' name"; or (iii) "pursuing registration with the U.S. Patent and Trademark Office of the name 'Colors+ Counseling' or any derivation of the name 'Colors+' or 'Colorsplus'." (*See* Doc. No. 5 at PageID #72.)

One final note. On September 6, 2024, Counseling filed a trademark application to register the name "Colors+ Counseling." (*See* Doc. No. 27-1 at PageID #755–61.) Therein, Counseling claims ownership of "active prior U.S. Registration Number(s) 6652187"—i.e., the trademark registration number for the Mark—as an "active prior registration" and "related properties

---

[63] The Court is conscious that the evidence presented at the hearing primarily centered around the use of the specific Mark itself as opposed to the first use of the name. As such, the Court clarifies that it has made no final determination here as to the ownership of the name "Colors+" or "Colorsplus." Rather, the Court merely concludes that based on the minimal evidence presented thus far, it cannot conclusively determine at this juncture that Colors+ owns the name such as to warrant the expansive injunctive relief sought by Colors+. The Parties will have the opportunity to explore this issue further in discovery and more fully address it at a later stage in the proceedings.

information." (*See id* at PageID #755, 758–59.) Given that the Court has invalidated Counseling's prior Trademark Registration as to the Mark, *see supra* Section IV.F.1, the information contained in Counseling's new trademark application for the name as to its "active prior registration" and "related properties information" is no longer true.

Accordingly, while the Court declines at this juncture to enjoin Defendants from pursuing the "Colors+ Counseling" name at all, the Court does order Defendants to file an amendment to their trademark application, within seven (7) days from the date of this Opinion, rectifying the now-false information contained in their trademark application filed on September 6, 2024 regarding ownership of the Mark at issue here—namely, that Counseling no longer owns the Trademark Registration of the Mark as it has been invalidated pursuant to this Opinion. *See* 4 GILSON ON TRADEMARKS § 25.05 ("An applicant may amend its application to comply with a requirement of the examining attorney, to correct an informality, to add, delete, or substitute a basis for registration, or otherwise to correct the application.").

### 3. Prohibiting Defendants from Representing that Colors+ is Defunct

Next, Colors+ requests an injunction "[p]rohibiting Defendants from representing to any person or entity that Colors+ is defunct or otherwise not providing services to the LGBTQ+ community." (Doc. No. 5 at PageID #72.)

The Court finds that this request is overbroad and beyond the scope of the issues presented in Colors+'s Motion. The issue for purposes of Colors+'s Motion is the service mark infringement— i.e., Colors+'s ownership over the Mark. The Court finds that an order prohibiting Defendants from making certain representations as to Colors+'s services is not closely tailored to that issue. Indeed,

this is not a defamation action—rather, the specific claim at issue is Colors+'s service mark infringement claim, addressing the ownership and use of the Mark.

Accordingly, the Court hereby denies this requested relief.

### 4. Prohibiting Defendants from Representing Themselves as a Non-Profit or Accepting Donations Intended for Non-Profits

Next, Colors+ seeks two related forms of injunctive relief pertaining to Defendants' status as a for-profit entity.  Specifically, Colors+ requests an injunction: (i) "[p]rohibiting Defendants from misrepresenting themselves as providing services other than for profit"; and (ii) "[p]rohibiting Defendants from accepting any donations, grants or perquisites intended for any non-profit organization, including without limitation, Colors+."  (Doc. No. 5 at PageID #73.)

In their Supplemental Brief, Defendants assert that it has not accepted any donations intended for Colors+ or other non-profits, nor has Colors+ demonstrated any evidence to the contrary.  (Doc. No. 30 at PageID #1008.)  Further, Defendants contend that they have not represented themselves as a non-profit, and that although they may provide some free or reduced cost services, they are permitted to do so.  (*Id.*)

The Court finds these points well-taken.  The scope of the issues presented, again, pertains to the concurrent use of the Mark that Colors+ owns, and any confusion caused as a result thereof.  Thus, any injunctive relief must be closely tailored to rectifying that issue.  *See CFE Racing Products, Inc.*, 793 F.3d at 595–96.  Therefore, the Court finds these requests to be overly broad and unsupported by the record.  Specifically, Colors+ has not presented evidence that Defendants have been misrepresenting themselves as a non-profit organization, or that they have been accepting donations intended for Colors+.  Although Colors+ indicates that a contract was sent from the ADAMHS Board to *Colors+* (*not Counseling*), there is no evidence that the same has occurred in the other direction,

and that as a result, Counseling chose to retain those contracts or funds.  While the ADAMHS contract is relevant to demonstrating confusion from the concurrent use of the Mark, it does not support the broad relief Colors+ requests here.  In similar fashion, as to Counseling offering free or reduced cost services, Colors+ has not demonstrated: (i) why Counseling is not permitted to do so; or (ii) how that pertains to the use of the Mark at issue here.

Accordingly, the Court hereby denies this requested relief.

### 5.    Requiring Defendants to Assist with Reinstatement of Social Media

As its final request, Colors+ requests an injunction "[r]equiring Defendants to assist reasonably in the reinstatement of Colors+ websites and social media sites."  (Doc. No. 5 at PageID #73.)

First, with respect to the Wix website, the Court finds that this issue is moot.  At the hearing, Cronin acknowledged that Lennon has since withdrawn the Wix Complaint.  (*See* 3/8/2025 Hearing Tr., 95:8-24.)  Further, Cronin conceded that website access was not a "live issue in this case anymore."  (*Id.* at 97:19-21.)  Finally, Cronin admitted that there was nothing that Defendants are doing currently that prevents Colors+ from making a more robust website.  (*Id.* at 98:19-21.) Accordingly, the Court denies this requested relief as moot.

Turning now to the remainder of the social media complaints, the Court finds that conflicting testimony exists on the issue.  At the hearing, Lennon testified that all social media complaints had been withdrawn as of October 2024, and that no other complaints have been submitted.  (*See* 4/8/2025 Hearing Tr., 377:10-378:4.)  However, Cronin testified that Colors+'s Instagram account has not yet been restored, despite reaching out to Instagram, "[b]ecause a trademark violation was filed against

84

us on Instagram by Lennon Pepera …"  (*See* 3/28/2025 Hearing Tr., 57:24-58:1, 98:1-7.)  It is thus not entirely clear to the Court whether the remaining social media complaints have been withdrawn.

Accordingly, in light of the conflicting testimony on the issue and out of an abundance of caution, the Court hereby orders that: (i) to the extent that any social media complaints pertaining to trademark infringement in relation to the Mark are still outstanding, they must be withdrawn by Defendants;[64] and (ii) Defendants are prohibited from filing any social media complaints against Colors+ alleging trademark infringement of the specific Mark at issue in this case.

### G.    Waiver of Bond

Finally, the Court turns to Colors+'s request for waiver of bond.

Fed. R. Civ. P. 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  Although the language of Rule 65(c) appears to be mandatory, the rule in the Sixth Circuit "has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Thus, "[w]hile a district court must consider whether security is appropriate, the court need not actually require security—instead, the decision is left to the sound discretion of the court." *Midwest Guar. Bank v. Guar. Bank*, 270 F. Supp. 2d 900, 925 (E.D. Mich. 2003).

Notwithstanding Rule 65(c), courts have permitted non-profit groups to proceed without posting security.  *See, e.g.*, *Greenpeace, Inc. v. Waste Technologies Industries*, 1993 WL 128732, at

---

[64] Thus, if Lennon is correct that all social media complaints have been withdrawn, no further action would be needed here by Defendants.  Similarly, to the extent that Cronin is correct that some social media complaints are outstanding, this Order adequately addresses those.

*3 (N.D. Ohio Jan. 21, 1993), favorably citing and characterizing *California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) ("within district court's discretion to allow a non-profit group to proceed in case because: 'The [district] court has discretion to dispense with the security requirement, or to request nominal security, where requiring security would effectively deny access to judicial review.'"); *Colorado Wild v. U.S. Forest Service*, 299 F. Supp.2d 1184, 1191 (D. Colo. 2004) (waiving security requirement for non-profit environmental group); *Prison Legal News v. County of Tulare*, 2015 WL 13850060, at *2 (E.D. Cal. Dec. 16, 2015) ("In these circumstances, waiver of the bond requirement is appropriate because Plaintiff is a small non-profit organization with limited resources.").

The Court finds that a waiver of security is appropriate here.  Cronin's affidavit indicates that Colors+ had an annual budget in 2024 of $400,000, which will be severely reduced in 2025 due to the non-profit's need to pursue litigation and vindicate its legal rights.  (Doc. No. 5-1 at PageID #95.) Cronin further avers that "Colors+ cannot afford to post any bond without jeopardizing its continued existence or its ability to pursue its claims."  (*Id.*)  Finally, Defendants do not address Colors+'s request or dispute the notion that waiver of security is appropriate.  Accordingly, the Court hereby orders that the bond requirement is waived.

## V. Conclusion

For the reasons set forth above, Colors+'s Motion for Preliminary Injunction (Doc. No. 5) is GRANTED IN PART and DENIED IN PART as follows:

Defendants, their agents, servants, and any and all parties acting in concert with any of them are temporarily and preliminarily enjoined from: (i) using the Colors+ service Mark; and (ii) using any variation of the Mark that resembles it in any way or manner.  Further, the Court hereby

86

invalidates Counseling's registration of the Mark—specifically, the trademark with U.S. Serial No. 90600142 and U.S. Registration No. 6652187 that Counseling filed for ownership of on March 24, 2021, and to which registration was issued on February 22, 2022.  Finally, the Court hereby orders that: (i) to the extent that any social media complaints pertaining to trademark infringement in relation to the Mark are still outstanding, they must be withdrawn by Defendants; and (ii) Defendants are prohibited from filing any social media complaints against Colors+ alleging trademark infringement of the specific Mark at issue in this case.

The remaining relief requested by Colors+ is DENIED.

**IT IS SO ORDERED.**


       _s/Pamela A. Barker_
       PAMELA A. BARKER
Date:  May 15, 2025        U. S. DISTRICT JUDGE